STATE OF NORTH CAROLINA v. CRAWFORD DREW REBER

No. 8423SC93

(Filed 6 November 1984)

Parent and Child § 2.2— felonious child abuse—insufficient evidence
     The State's evidence was insufficient to support defendant's conviction of
     felonious child abuse in violation of G.S. 14-318.4 where it tended to show only
     that the child's health had been seriously impaired by an injury of some kind
     but did not tend to show that the injury was inflicted by defendant or that
     defendant inflicted the injury intentionally.

APPEAL by defendant from *Collier, Judge.* Judgment entered 11 May 1983 in Superior Court, ALLEGHANY County. Heard in the Court of Appeals 27 September 1984.

Defendant was tried for and convicted of felonious child abuse in violation of G.S. 14-318.4. The child allegedly abused was his three and a half month old daughter, Tiffany. Both the State and the defendant presented evidence, which was to the following effect:

Defendant married Tami Wolf Reber in 1975 and they had two children, Tabitha, born in 1979, and Tiffany, born 13 Feb-

ruary 1982, and lived with the children in Alleghany County at the times involved. Although the child, Tiffany, looked fine at birth, during the next three months she had several illnesses, including a virus, several episodes of erratic, labored breathing, followed by lethargy or unresponsiveness for an hour or so, and periodic rashes on different parts of the body. She often vomited when fed. Bathing often made the child lethargic and unresponsive; and she often had trouble breathing. One night when the child was six to eight weeks old, she had a very hard time breathing immediately after being bathed; and for an hour and a half or so thereafter she just laid with a dead stare in her eyes, like she just wanted to sleep, and her only response to Mrs. Reber's attempts to arouse her was a low, moaning, hypertonic cry. The next morning, alarmed at the child's condition, Mrs. Reber took her to the family physician, Dr. Cahn.

Sunday morning, May 30, 1982, Mrs. Reber dressed and nursed the child about 9 o'clock, and about 9:30 left the child with defendant and went next door to use a neighbor's telephone. When Mrs. Reber left the child appeared to be fine. When she returned about ten minutes later, the defendant and the other child were in the carport washing windows where he could see the crib. Defendant told Mrs. Reber that Tiffany had a choking spell. Mrs. Reber ran into the house and found the baby lying on her stomach, very sleepy, and breathing very erratically; one of her eyes was straight and the other sort of veered off, and she cried in the same sick, hypertonic way that she did when she was between six and eight weeks old. Mrs. Reber picked up the baby and looked into her eyes, trying to arouse her and get her to respond. She did not see defendant do anything to the child except hold her up and move her about when they were trying to get her to respond. She, herself, also held the child up and tried to bounce her to make her start breathing and open her eyes. After about five minutes of this, without the child improving, Mrs. Reber asked their neighbor to take her and Tiffany to the Alleghany Memorial Hospital about five minutes away. Defendant stayed home with the other child for awhile, but went to the hospital later. On the way to the hospital, Mrs. Reber alternately gave the baby mouth-to-mouth resuscitation, and picked her up under the arms, not supporting her head, and shook her. When they got to the hospital the baby was limp, pale, and breathing very shallow-

ly, if at all. When Dr. Cahn saw Tiffany, her skin was blue, he couldn't tell whether she was breathing or not, and she responded only to painful stimulation. Her temperature was four degrees below normal and they did blood tests and warmed her. Three hours later they transported her to North Carolina Baptist Hospital in Winston-Salem. Dr. Cahn, Mrs. Reber, and an ambulance attendant rode in the ambulance with the baby, who was placed in an infant transfer isolette that provided her with warmth and oxygen. Every minute or so, to arouse the child and make her breathe, Dr. Cahn shook the child's hand or foot.

At Baptist Hospital Tiffany was attended by Dr. Sara Sinal, who observed and treated her from the day after admission until her release on 1 July 1982. When Dr. Sinal saw Tiffany for the first time she was semiconscious, responding only to painful stimuli. For about a week or so Tiffany had intermittent epileptic-type jerking motions of the arms and legs associated with periods of lethargy, called postictal periods. Dr. Sinal asked Dr. Richard Weaver, an ophthalmologist, to evaluate the child and he noted that blood vessels in the retina were ruptured and blood was in the vitreous, a jelly-like substance filling the inside of the eyeball, which he felt was probably due to increased inter-cranial pressure. He admitted that he had no way of knowing how long the blood had been there. The presence of a sub-arachnoid hemorrhage was confirmed by CAT scans taken May 30, June 6 and June 23.

Dr. Sinal testified that: Trauma of some kind most likely caused the hemorrhage, but upon examining Tiffany's head she found no external evidence of trauma. Either a very diffused blow or a severe shaking injury can produce such an effect without external trauma; but she had no history to document either a blow or a shaking as the cause of injury. This type of injury is peculiar to babies under six months of age, because the strap muscles that give head control are not well developed and there is more flexibility in the skull for the brain to bounce around inside. She had no information from talking with the parents that they shook the baby and no history to document either a blow or a shaking as a cause of the injury. She did not see how the baby could have caused the injury to herself without there being some history of a fall from a great height. She had heard of a fall from a couch, but did not think it would have caused this injury. She was of the

opinion that Tiffany was a victim of the battered child syndrome, which she defined as the symptoms a child has when it receives an injury either from the parent or by neglect, and that the injury was not accidental, since the parents gave no history of an accidental injury.

*Attorney General Edmisten, by Associate Attorney General Debra K. Gilchrist, for the State.*

*Appellate Defender Stein, by Assistant Appellate Defender Malcolm R. Hunter, Jr., for defendant appellant.*

PHILLIPS, Judge.

The sole question raised by this appeal is whether all the evidence presented at trial was sufficient to establish defendant's guilt of the offense charged. The State mistakenly contends that this question is not properly before us because defendant, after moving to dismiss at the end of the State's case, introduced evidence and did not "renew" his motion to dismiss at the end of all the evidence. Since this same contention has been made in several other criminal appeals recently, we point out that a defendant's failure to either "renew" his motion at the end of the evidence, or even make a motion to dismiss for the first time, does not affect his right to contend on appeal that the evidence presented by both parties was insufficient to warrant his conviction. First of all, a motion to dismiss made at the end of the State's evidence cannot be "renewed," as that word is usually understood, after the defendant has put on evidence; and using that misnomer tends to confuse a matter that is really quite simple when the statutes are examined. For as G.S. 15-173 makes crystal clear, the right that a defendant in a criminal case has to test the sufficiency of *just* the State's evidence, under a motion for nonsuit or dismissal made at the end of the State's evidence, is lost for good and all, never to be revived by any motion whatever, when he puts on evidence, and any motion made thereafter tests all the evidence, rather than just the State's. And as G.S. 15A-1227(d) and G.S. 15A-1446(d)(5) make equally clear, in appealing a criminal case a defendant has a right to question the sufficiency of all the evidence to convict him, even though no motion to dismiss was either made or "renewed" during the entire course of the trial. Since this defendant properly assigned as error the court's failure

to dismiss the case at the close of all the evidence because the evidence presented was insufficient to convict him of the crime charged, he is entitled to our judgment with respect thereto.

To validly convict the defendant under the indictment lodged against him, the State had to prove that he intentionally inflicted a serious injury on the three and a half month old child, which resulted in the substantial impairment of the child's physical health. G.S. 14-318.4. The only element of the offense that the evidence presented tends to establish is that the child's health has been seriously impaired by an injury of some kind; it does not tend to show that the injury received by the child was inflicted by the defendant or that he inflicted such injury intentionally. *State v. Byrd*, 309 N.C. 132, 305 S.E. 2d 724 (1983). Nor is this gap in the evidence filled by the rather extensive opinion testimony of Dr. Sinal, which we accept at face value, in its most favorable light for the State, as the law governing appeals of this type requires. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). Because even if the child had all the signs and symptoms of an abused child and it was proper to infer therefrom, as Dr. Sinal opined, that the child had not been injured accidentally, but intentionally, it cannot be inferred from that inference that defendant is the one who injured the child and did so intentionally. The State's argument that the child's good condition when Mrs. Reber left to use the neighbor's telephone and its bad condition a few minutes later established that defendant injured the child, since he was the only adult there, is without merit. If the injury had been a broken bone that was sound ten minutes earlier, the argument would be persuasive. But the injury in this instance, to blood vessels deep in the skull, was invisible, and the evidence does not show when or how it occurred. None of the doctors, including Dr. Sinal, expressed the opinion that the injury that caused the hemorrhaging of the blood vessels happened during the brief interval while Mrs. Reber was gone, or even that Sunday. The possible time of the hemorrhaging was alluded to only by Dr. Weaver, who testified that he had no way of knowing how long the blood in the eyes, which came from the injured brain, had been there. And though Dr. Sinal expressed the opinion that the injury may have resulted from a violent shaking of the child, there was no evidence that defendant had ever shaken the child, violently or otherwise. Furthermore, as Dr. Weaver testified,

"[t]here are many causes of increased intercranial pressure," which can result in the condition that the child was in. Thus, the verdict that defendant intentionally injured the child that Sunday morning was based on speculation and conjecture, not evidence, and cannot stand. *State v. Vestal*, 278 N.C. 561, 180 S.E. 2d 755 (1971), *cert. denied*, 414 U.S. 874, 38 L.Ed. 2d 114, 94 S.Ct. 157 (1973).

We therefore vacate the judgment of conviction and direct that a judgment of acquittal be entered.

Vacated and remanded.

Judges HEDRICK and BECTON concur.