STATE

v.

**Derek A. SIVO.**

**No. 2004–358–C.A.**

Supreme Court of Rhode Island.

June 15, 2007.

Aaron L. Weisman, Esq., Diane Daigle, Esq., Providence, for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

On October 23, 2002, a jury found the defendant, Derek A. Sivo (defendant), guilty of one count of first-degree child abuse, in violation of G.L.1956 § 11–9–5.3(b)(1).[1] The defendant appeals his conviction, alleging that the trial justice erred in: (1) denying the defendant's motion for a judgment of acquittal; (2) instructing the jury that the state was not required to prove that the defendant intended to inflict physical injury upon the child; (3) determining that the Family Court had subject-matter jurisdiction over this case; (4) directing a verdict on an element of the offense; and (5) imposing an enhanced sentence based on a factor not specifically found by the jury. The defendant also contends that defects existed in the trial justice's appointment and in jury selection, which rendered the proceedings null and

---

1. The defendant was charged under G.L.1956 (2000 Reenactment) § 11–9–5.3(c)(1), as amended by P.L.2001, ch. 109, § 1. We refer to this statute's current reenactment for clarity, as the revisions to the specific subsection charged were merely stylistic.

void. For the reasons set forth herein, we affirm the judgment of the Family Court.

# I

## Facts and Travel

A tragic series of events from August to November 2001 resulted in two-and-a-half-year-old John W. Jr.'s (John Jr.) admission to Hasbro Children's Hospital (Hasbro) in Providence for an emergency craniotomy. Two blood clots were removed from John Jr.'s brain: one "fresh" bleed caused by an injury that occurred anytime between a few days to mere hours before surgery, and one older bleed from an injury that occurred between four and eight weeks prior. Although pediatric neurosurgeon John Allison Duncan III, M.D. (Dr. Duncan) and his surgical team were able to save John Jr.'s life, the child suffered significant residual problems from his injuries, including weakness to his right side, a lack of peripheral vision, speech problems, and a permanent limp. The seriousness of John Jr.'s injuries and the hospital staff's inability to determine their cause prompted the Hasbro Child Protection Team to contact police.

A Cranston Police Department investigation eventually uncovered the evidence underlying a criminal information charging defendant with one count of first-degree child abuse, filed on February 13, 2002. On October 15, 2002, defendant's four-day trial ensued. Chief Judge DeRobbio of the District Court, sitting in the Family Court by designation, presided over defendant's jury trial. We set forth below the most significant testimony given by the several witnesses who testified at trial.

Cheryl Flynn, M.D. (Dr. Flynn), John Jr.'s pediatrician, testified that she had seen John Jr. regularly from the time he was four months old. During his first visits, she took John Jr.'s family and social history and was told that he did not have a history of seizures. At trial, Dr. Flynn recalled three instances when John Jr. was taken to the emergency room. First, on September 5, 2001, Kimberly Mathieu (Kim), John Jr.'s mother, called Dr. Flynn and told her about John Jr.'s admission to Hasbro on August 30. Doctor Flynn later received John Jr.'s hospital report, including the results of a Computed Axial Tomography scan (CAT scan), which were negative. On October 9, Kim again contacted Dr. Flynn and told her that John Jr. was vomiting, not wetting his diaper and not acting like himself. When Dr. Flynn saw John Jr. later that day, he was extremely exhausted and would not drink any liquids. Doctor Flynn told Kim to take John Jr. to Hasbro's emergency room. John Jr. was admitted to the hospital for three days, during which time he underwent a number of tests. Doctor Flynn believed these tests revealed that he was suffering from viral gastroenteritis.

Doctor Flynn also testified about the events preceding John Jr.'s craniotomy the next month, on November 2. Doctor Flynn received a call from Kim that morning reporting that John Jr. was exhibiting the same symptoms that he had on October 9. She scheduled John Jr. for an appointment, at which John Jr. was too ill to hold himself up and was virtually non-conversant. Doctor Flynn testified that she did not see any signs of abuse on John Jr.'s body, but she clarified that she did not remove his clothing during the examination because he was so weak. She advised Kim to take John Jr. directly to the hospital.

Detective Thomas Dodd (Det.Dodd) of the Cranston Police Department testified that he arrived at Hasbro at approximately 7 p.m. on November 2, in response to a report that a two-and-a-half-year-old who was being treated there possibly was a

victim of child abuse. After speaking to Kim and one of John Jr.'s doctors, Det. Dodd determined that the alleged abuse likely occurred at defendant's residence in Cranston. Detective Dodd testified that defendant voluntarily reported to the Cranston Police Department for questioning at about 10:40 that night. While there, defendant gave a chronology of the previous day, November 1, and composed a signed statement recounting the same. According to Det. Dodd, defendant said that Kim had considered staying home from work that morning because John Jr. was cranky, but eventually went to work, leaving John Jr. with defendant. The defendant played with John Jr. and took him out to pick up lunch. The defendant told Det. Dodd that, upon their return home, defendant and John Jr. were walking down the winding stairway that leads to their basement apartment when, as they neared the bottom of the stairwell, John Jr. let go of defendant's hand. As John Jr. rounded the corner, defendant heard him fall down the last few stairs. When defendant saw John Jr. on the ground, he was not crying, but he indicated that his "butt" and the back of his head hurt. As he rubbed John Jr.'s injuries to make them feel better, defendant noticed a small red mark on the back of John Jr.'s head. The defendant and John Jr. took a nap later that afternoon because John Jr. was so ill. When Kim returned home, defendant told her about John Jr.'s fall.

Detective Dodd visited defendant's house in Cranston and observed and photographed the staircase down which defendant said John Jr. had fallen. He showed the pictures to Seth Asser, M.D. (Dr. Asser), who was a member of the Child Protective Team at Hasbro in November 2001, in an attempt to determine whether John

Jr.'s injuries could have been caused by his fall, specifically by striking his head against a four-inch cast-iron pipe that protruded into the stairway or otherwise. According to Det. Dodd, Dr. Asser responded to his inquiry with a letter, the contents of which prompted Det. Dodd to bring charges against defendant.

Detective Kevin Shea (Det.Shea) of the Pawtucket Police Department also testified for the state. He responded to Hasbro on November 2 to begin a preliminary investigation into an alleged child abuse.[2] When Det. Shea arrived at the hospital, John Jr. already was being treated for his potentially life-threatening head injury. Detective Shea took tape-recorded statements from defendant and John Jr.'s relatives who were at Hasbro. He turned the recordings over to the Cranston Police Department after he determined that any injuries to John Jr. probably occurred in Cranston, thus removing the investigation from his jurisdiction. The state played the audiotape of defendant's interview with Det. Shea for the jury.

Vanessa Ciesla, a child protective investigator for the Department of Children, Youth and Families (DCYF), also testified for the state. She went to Hasbro on November 2 after receiving a report of possible child abuse on the DCYF Hot Line. Once there, Ms. Ciesla interviewed John Jr.'s doctor and his family members. She also interviewed defendant later that day at the Cranston Police Department. During this interview, defendant gave an account of his day with John Jr. on November 1, which was consistent with both his tape-recorded statement to Det. Shea and his statement to Det. Dodd.

The state also offered the expert testimony of John Jr.'s two treating physicians

**2.** Detective Shea testified that the Pawtucket Police Department was contacted because John Jr.'s hospital records indicated that he lived in Pawtucket.

at Hasbro. First, the state called Dr. Duncan, chief of neurosurgery at Brown University Medical School and an expert in pediatric neurosurgery. He testified that he first saw John Jr. on November 2 in the operating room after he had been prepared for surgery. Doctor Duncan testified that John Jr. needed surgery to save his life because he had a subdural hematoma and increased intercranial eye pressure on his brain. Doctor Duncan observed the presence of both "old blood," indicating a previous serious head injury, and "new blood," indicating a more recent severe head injury. It was Dr. Duncan's opinion that a non-accidental major blow to the cranium caused John Jr.'s head injury, akin to the type of injury that would occur if he had fallen out a window from a significant height or been hit by a motor vehicle. Doctor Duncan explained that, after such a blow, John Jr. would not have been able to talk and would have fallen asleep. He also testified that John Jr.'s injury could not have been caused by a fall down the stairs in defendant's apartment. In fact, the only way Dr. Duncan believed defendant's stairwell could have caused John Jr.'s injuries would have been if he was forcefully thrown down all the stairs and landed primarily on his head. During the course of John Jr.'s treatment, Dr. Duncan reviewed the CAT scans of his brain taken on November 2 and August 29. Although the CAT scan taken in August originally was classified as "normal," Dr. Duncan testified that his residents later reported a possible small subdural hematoma, but that it was "a very very tough call." He also said that a subdural hematoma in a child like John Jr. could not have been caused by a single seizure because a seizure alone does not produce a hematoma.

On cross-examination, Dr. Duncan testified that, commonly, there is a visible mark on the scalp of a child who suffers a subdural hematoma and that he did not see any marks on John Jr.'s body evidencing the cause of his injury. He clarified, however, that he did not see John Jr. before he already was prepped for surgery and, thus, did not examine his head for injuries before his scalp was opened. He said that he could not say where or how John Jr.'s injury occurred, but could pinpoint the approximate time of John Jr.'s two brain injuries. He testified that John Jr. suffered one injury at least four to eight weeks before his surgery, leading to chronic fluid in his brain membranes, as well as a second injury occurring anytime between a few days to a few hours before surgery. Doctor Duncan testified that he was concerned about John Jr.'s injuries because no one could explain how they were incurred. Doctor Duncan could not conclusively determine whether the injuries constituted child abuse because that determination was for a jury to make.

Doctor Asser testified that he treated John Jr. on November 2 when he arrived at Hasbro. He observed that John Jr. was experiencing an altered level of consciousness and was virtually nonresponsive. He interviewed Kim and she told him that John Jr. had not been his usual self since she returned home from work the previous evening. Kim told Dr. Asser that John Jr. was not well all night and was not responsive when she tried to wake him at 10 a.m. on November 2. It was then that Kim took John Jr. to Dr. Flynn's office and eventually to Hasbro. Doctor Asser said that he spoke with defendant, who told him about John Jr.'s fall the previous day. Doctor Asser also learned of John Jr.'s two prior admissions to Hasbro, in August and October. He testified that he reviewed the August CAT scan, which showed a generally normal brain with a slight change in color consistent with minor blood flow. Doctor Asser compared the August CAT

scan with the November CAT scan, which showed asymmetry and swelling in John Jr.'s brain accompanied by a very clear subdural hematoma and dead brain cells. Doctor Asser testified that John Jr.'s brain injury consisted of both an old blood clot that was at least a couple of weeks old and a new blood clot twenty-four to forty hours old.

Like Dr. Duncan and Dr. Flynn, Dr. Asser did not observe any outward signs of the cause of John Jr.'s brain injury. Even so, Dr. Asser classified John Jr.'s injury as nonaccidental, caused by an acceleration and deceleration of the brain like that caused by a car accident or a fall from a height of several stories, and *not* by a fall down a few stairs or a seizure. Doctor Asser also believed that John Jr. absolutely would have acted abnormally immediately following his injury; he would not have been able to stand or walk, may have been groggy, would not have responded if someone talked to him or moved him, and would have been moaning. Doctor Asser testified that he diagnosed John Jr.'s injuries as child abuse and eliminated "shaken baby syndrome" and an undiagnosed seizure condition as potential causes.

Kim testified that John Jr. was born on March 8, 1999. She said that John Jr. was a very smart and happy baby for the first two years of his life. It was about a month after John Jr.'s second birthday that she began seeing defendant. When Kim and defendant first started dating, they did not live together; Kim was living with a friend and defendant was living in the basement apartment in his father's house on Vigilant Street in Cranston. Kim and John Jr. were spending nights at defendant's house in August 2001. It was at this time that defendant started watching John Jr. occasionally when Kim went to work.

Kim testified that a friend called her at work later that August—on a day defendant was watching John Jr.—and told her defendant had taken John Jr. to the hospital. The defendant later explained to Kim that he was in his room watching television when he heard "a little thump" come from John Jr.'s room. He told Kim that, when he checked on John Jr., he found the child on the floor, dazed, with his head to the side. The defendant said he immediately called 911. When Kim saw John Jr. later that evening at Hasbro, he had a rug burn on his face, but seemed all right and was released. Kim said that, on the day after John Jr. came home from the hospital, he fell in the bathroom and hit the back of his head on the tile floor. Kim testified that these two incidents marked the beginning of John Jr.'s frequent falls.

Kim also testified in detail about the events leading up to John Jr.'s November 2 surgery. She said she and John Jr. had moved in with defendant in October and were living with him on November 1. She said that John Jr. woke up around 7:30 or 8 a.m. that day, as was his usual custom. She took him to get a doughnut before she left for work and noticed that he was a little cranky, but generally all right. Kim went to work around 11:15 a.m. and called defendant between 3:30 and 4:30 p.m. to check on John Jr. The defendant told her that John Jr. was sick, but did not mention John Jr.'s fall until Kim returned at about 6:30 p.m. When John Jr. did not wake up the next morning as usual, Kim called Dr. Flynn and eventually brought John Jr. to Hasbro.

John W. Sr., John Jr.'s biological father, and Roseann Mathieu (Roseann), John Jr.'s maternal grandmother, also testified for the state. Both John and Roseann testified that John Jr. was not a clumsy child and fell no more than the average two-year-old. John also testified about

how John Jr.'s life has changed because of the residual effects of his injuries, and Roseann testified that John Jr. did not want to return to defendant's home after visits.

The defendant presented one witness in his defense: Thomas Morgan, M.D. (Dr. Morgan), a practicing neurologist. Doctor Morgan testified that, in his expert opinion, John Jr. was not the victim of abuse. Instead, he believed that John Jr.'s injuries stemmed from an August 2001 seizure that later caused John Jr. to become weaker on his right side and, thus, clumsier and more prone to falls. He believed that the initial August 2001 brain injury predisposed John Jr. to the second brain injury, in November, and that the two falls together were sufficient to produce an acute and chronic subdural hematoma. Doctor Morgan said that a linear abrasion on the back of John Jr.'s neck was consistent with defendant's description of John Jr.'s fall down the stairs on November 1. Doctor Morgan explained that, because John Jr. had a chronic subdural hematoma from the August fall, when he suffered the fresh subdural hematoma on November 1, it would have taken time for the blood to enlarge, expand, and create pressure on John Jr.'s brain sufficient to make him weak and lethargic. According to Dr. Morgan, this explained why John Jr. was able to function normally immediately after the fall, but later was very ill and unable to hold himself up or speak normally. On cross-examination, Dr. Morgan admitted that he never actually examined John Jr. and that he reached his conclusions by reviewing police reports and medical records and interviewing John Jr.'s mother.

At the close of all the evidence, defendant made a motion for judgment of acquittal, which was denied. Subsequently, the trial justice issued the jury charge, in which he instructed that the fact that John Jr. was a child under eighteen years of age had been proven and that the jury had to accept that the age element of the offense had been established. The trial justice also instructed that, to find defendant guilty of first-degree child abuse, the jury had to find that he acted "knowingly and intentionally," which the trial justice characterized as a general intent crime. The defendant objected to both of these portions of the jury instruction.

A jury found defendant guilty of first-degree child abuse. The defendant subsequently filed a motion for a new trial, which was heard and denied on February 10, 2003. He was sentenced on March 24, 2003, to a term of twenty years imprisonment, twelve to serve, with eight suspended, with probation. The defendant filed a notice of appeal on March 24, 2003, and, on January 19, 2005, pursuant to defendant's motion, this Court remanded the case to the Family Court by order for a hearing on defendant's motion for new trial and his motion to vacate the conviction and sentence. The trial justice heard and denied defendant's motions on February 18, 2005. The defendant's appeal later was re-docketed by this Court.

## II

## Analysis

On appeal, the defendant raises a number of claims of error. We address each argument separately.

## A

### Motion for Judgment of Acquittal

■ This Court's standard of review when evaluating the denial of a motion for judgment of acquittal is well established: We apply the same standards as those applied by the trial justice. *State v. Briggs*, 886 A.2d 735, 760 (R.I.2005). In

doing so, we view the evidence in the light most favorable to the state, without weighing evidence or assessing witness credibility, and we draw all reasonable inferences consistent with guilt from the evidence. *Id.* (citing *State v. Grayhurst*, 852 A.2d 491, 519–20 (R.I.2004)). Viewing the evidence in this light, a trial justice's denial of a motion for a judgment of acquittal will be upheld if the evidence is sufficient to sustain a jury verdict of guilty. *State v. Mendoza*, 889 A.2d 153, 159 (R.I.2005).

■ Section 11–9–5.3(b)(1) defines first-degree child abuse, in relevant part, as follows:

"(b) Whenever a person having care of a child * * * whether assumed voluntarily or because of a legal obligation, including any instance where a child has been placed by his or her parents * * * for care or treatment, knowingly or intentionally:

"(1) Inflicts upon a child serious bodily injury, shall be guilty of first degree child abuse."

Thus, the state must prove beyond a reasonable doubt that: (1) the victim was a child; (2) the victim was in the defendant's care; (3) the defendant inflicted serious physical injury upon the victim; and (4) the defendant did so knowingly or intentionally. The state may satisfy this burden by resting its case upon circumstantial evidence alone and need not disprove all possible theories of innocence so long as "the totality of the circumstantial evidence offered constitutes proof of guilt beyond a reasonable doubt." *State v. Caruolo*, 524 A.2d 575, 581 (R.I.1987) (citing *In re Derek*, 448 A.2d 765, 768 (R.I.1982)). "Therefore, when measuring the sufficiency of the state's evidence, no distinction is to be drawn between circumstantial and direct evidence and the only standard for ruling the evidence insufficient is a reasonable doubt of guilt." *Id.* Thus, "[t]he pivotal

question in determining whether circumstantial evidence is sufficient to prove guilt beyond a reasonable doubt is whether the evidence in its entirety constitutes proof beyond a reasonable doubt or is of such a nature that it merely raises a suspicion or conjecture of guilt." *Id.* If, however, the initial inferences "rest [ ] upon an ambiguous fact that is equally capable of supporting other reasonable inferences clearly inconsistent with guilt," the pyramiding of inferences becomes speculative and insufficient to prove guilt beyond a reasonable doubt. *Id.* at 582.

Here, defendant contends that, even when viewed in a light most favorable to the state, insufficient evidence was presented to allow the jury to find beyond a reasonable doubt that John Jr.'s injury occurred specifically during the time defendant was caring for him. This dearth of evidence, defendant argues, forced the jury to speculate about what exactly happened to John Jr. and when, and likens his situation to that of the defendants in two sister-state decisions: *State v. Reber*, 71 N.C.App. 256, 321 S.E.2d 484 (N.C.App. 1984) and *Moriarity v. State*, 620 N.E.2d 696 (Ind.1993). We disagree.

After examining both *Reber* and *Moriarity*, we are convinced that they present circumstances distinguishable from defendant's. In *Reber*, the defendant was convicted of felonious child abuse in violation of a North Carolina statute requiring that the state prove the defendant "*intentionally* inflicted a serious injury * * * which resulted in the substantial impairment of the child's physical health." *Reber*, 321 S.E.2d at 484, 486 (emphasis added). The defendant's sole argument on appeal was that the state presented insufficient evidence at trial to establish his guilt. *Id.* at 485. The court concluded that the state only established that the child's health was seriously impaired by *some* injury, but

that it failed to show that the child's injury was inflicted by the defendant or that the defendant intentionally inflicted the injury. *Id.* at 486. The court was concerned that the jury would have had to make an impermissible inference that the defendant intentionally inflicted the injury from only an inference supplied by the testimony of two doctors—that this child with a history of unexplained illnesses who exhibited signs of child abuse was, in their *opinion,* injured intentionally. *Id.* Even when viewed in connection with evidence that the child's condition was fine when her mother left their house, but was critical when she returned a few minutes later, the court held that the doctors' testimony provided an insufficient basis for the jury to find beyond a reasonable doubt that the defendant *intentionally* injured his daughter. *Id.* at 484, 486. The *Reber* court was particularly concerned that witnesses were unable to provide a time frame during which the injury must have occurred. *Id.* at 486. Thus, the court held that the defendant's conviction could not stand. *Id.* at 487.

In *Moriarity,* a jury convicted the defendant of murder for the death of his infant son, who doctors testified died from a massive blood clot on his brain. *Moriarity,* 620 N.E.2d at 696–97. The defendant claimed on appeal that the evidence presented at trial was insufficient to sustain his murder conviction. *Id.* at 697. Testimony showed that the only time the defendant was alone with the baby the day of the injury was for approximately one hour and five minutes during which the baby stopped breathing. *Id.* Testimony further indicated that the child's injury—a single blow to his head that produced no bruising or other external evidence of injury—could have been caused by a slap from a human hand or by contact with a flat padded surface occurring between twenty minutes and six hours before defendant called 911 for help. *Id.* at 697–98. The Indiana Supreme Court reasoned that because, "under the [s]tate's evidence, the blow suffered by the child could well have occurred prior to the child being left in the care of [the defendant,]" and because no evidence was presented from which a reasonable juror could find that the defendant *"deliberately* injured the child[,]" the conviction rested on suspicion of guilt alone and not credible evidence of guilt beyond a reasonable doubt. *Id.* at 698 (emphasis added). Therefore, the court held that the defendant's conviction could not stand. *Id.*

In denying defendant's motion for judgment of acquittal in this case, the trial justice correctly stated that his role was to draw "all reasonable inferences consistent with guilt" and not to weigh the evidence or assess credibility. The trial justice noted that the record was clear that the child, John Jr., was under eighteen years of age. He also noted that uncontested evidence showed that defendant was John Jr.'s caretaker at the time the child allegedly fell on November 1. The trial justice also found that John Jr.'s injury constituted a serious bodily injury that resulted in permanent damage. In fact, the only contested issues at trial involved exactly when and how John Jr.'s injury occurred. The state alleged that the injury occurred on November 1, the day before John Jr. was admitted to Hasbro with a subdural hematoma. The state's expert witnesses, who treated John Jr. at Hasbro, testified that John Jr.'s injury involved a "new bleed" caused by a nonaccidental trauma suffered only twenty-four to forty hours before his admission to Hasbro, which trauma would have immediately caused John Jr. to lose his ability to stand or walk and become groggy and unresponsive. Based on this evidence, the trial justice found that the state presented sufficient evidence for the jury to reasonably conclude that defendant was guilty beyond a reasonable doubt, and denied defendant's motion for judgment of acquittal.

Our review of the record confirms both the accuracy and adequacy of the trial justice's review of the evidence. There was no gap in the evidence presented in this case that would require the speculation and conjecture that troubled the appellate courts in *Reber* and *Moriarity*. In this case, the state presented uncontested evidence that Kim left John Jr., who was functioning normally, in defendant's custody when she went to work at about 11:15 a.m. on November 1. When Kim returned home around 6:30 p.m., defendant told her that John Jr. was sick and in bed sleeping. The next morning, John Jr. did not wake up on his own, was unresponsive, and was unable to hold himself up. The state's expert doctors, who treated John Jr. at Hasbro, testified that the injury producing John Jr.'s "new bleed" occurred within twenty-four to forty hours before he was admitted to the hospital in the early afternoon on November 2. They also testified that John Jr. would not have been able to walk, talk, or function immediately after the injury, which they classified as "nonaccidental." Because John Jr. was walking, talking, and functioning when Kim left the house on the morning of November 1, the evidence presented was sufficient to permit a reasonable juror to conclude that John Jr. was in defendant's exclusive care all day, that John Jr.'s injury occurred during the time defendant was caring for him, and that it was defendant—being John Jr.'s lone caretaker—who caused the nonaccidental head trauma. Accordingly, we uphold the trial justice's decision to deny defendant's motion for judgment of acquittal.

## B

### Jury Instructions

The trial justice instructed the jury on first-degree child abuse, in relevant part, as follows:

"There are four elements that the state must prove beyond a reasonable doubt: number one, that the victim was a child, and by law a child under the age of eighteen years of age. And I charge you as a matter of law that that issue and that element has been proven, and that there is no dispute on that element.

"The second element is that the defendant had care of the child.

"The third element is that the defendant inflicted upon said child serious bodily injury.

"And four, that the defendant did so knowingly and intentionally.

"Now, the first element I have indicated to you, you must accept as proven, proven already.

" * * *

"The state must also prove beyond a reasonable doubt that the defendant * * * intended to do the described acts, knowingly and intentionally; a person acting knowingly and intentionally when he or she does an act deliberately and purposely, and does not do so of mistake or accident or other innocent reason.

"Child abuse is a general intent crime. General intent means that a person means to commit the act itself without a specific intent to bring about some particular end or result."

The defendant alleges two errors relating to the trial justice's jury instructions: (1) the trial justice erred when he instructed the jury on the level of intent required to find defendant guilty of first-degree child abuse beyond a reasonable doubt and (2) the trial justice erroneously instructed the jury that the child's age already was proven as a matter of law, thus removing from the jury's deliberations an essential element of the crime.

■ When this Court reviews a challenged jury instruction, we examine the charge "in its entirety, 'in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give [to the instructions].'" *Saber v. Dan Angelone Chevrolet, Inc.*, 811 A.2d 644, 653 (R.I.2002) (quoting *Patino v. Suchnik*, 770 A.2d 861, 866 (R.I.2001)). The trial justice is bound to ensure that the jury charge "sufficiently addresses the requested instructions and correctly states the applicable law." *State v. Coleman*, 909 A.2d 929, 938 (R.I.2006) (quoting *State v. Aponte*, 800 A.2d 420, 427 (R.I.2002)). However, "[a]n erroneous charge warrants reversal only if it can be shown that the jury 'could have been misled' to the resultant prejudice of the complaining party." *Saber*, 811 A.2d at 653 (quoting *Patino*, 770 A.2d at 866).

1

### *Mens Rea* Under § 11–9–5.3

■ The defendant argues that the trial justice committed reversible error when he instructed the jury that it could convict defendant if the jurors found he acted intentionally, regardless of whether he had the specific intent to bring about the particular result. Specifically, defendant relies upon this Court's decision in *State v. Lima*, 546 A.2d 770 (R.I.1988), to support his contention that the trial justice erred by failing to instruct the jury that first-degree child abuse requires a specific intent to cause serious bodily injury.

In *Lima*, the defendant was convicted of first-degree child abuse for lowering a small child into a bathtub of scalding water, causing him to suffer permanent disfigurement or disability. *Lima*, 546 A.2d at 771. The child abuse statute implicated in *Lima*, § 11–9–5.3(a), provided, in pertinent part, that "[w]henever any * * * [caretaker] * * * abuses [a] child by in-

flicting upon said child a physical injury, to the extent the child is permanently disfigured or disabled, he or she shall be guilty of child abuse in the first degree * * *." General Laws 1956 (1981 Reenactment) § 11–9–5.3, as amended by P.L.1983, ch. 179, § 1. Evidence introduced at trial showed that the defendant told the child's father that she had intentionally put the child in the bathtub to wash him, but had not first checked the water temperature, which, unbeknownst to the defendant, was far too hot. *Lima*, 546 A.2d at 771. The trial justice instructed the jury on the elements of the child abuse statute, but did not instruct the jury that intent was a necessary element of the crime charged. *Id.* The defendant appealed, alleging that the trial justice committed error when he refused to instruct the jury that an intentional act was required. *Id.* This Court held that the trial justice's refusal to so instruct the jury constituted reversible error. *Id.* at 772. Because the child abuse statute in place at the time was entirely devoid of words of intent, we adopted a standard similar to that set forth in the Model Penal Code (MPC), requiring that "[w]hen the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts purposely, knowingly or recklessly with respect thereto." *Lima*, 546 A.2d at 772 (quoting Model Penal Code, § 2.02(3) at 226 (A.L.I.1985)). Pursuant to this standard, we directed the trial justice on remand to instruct the jury accordingly, to "protect [ ][the] defendant from a conviction predicated upon an act devoid of *mens rea* while at the same time protecting a class of defenseless victims from physical abuse." *Id.*

In the years after *Lima*, the General Assembly enacted numerous amendments to the first-degree child abuse statute. What is most significant to the instant

litigation is that, in 1995, the General Assembly added words of intent, prescribing punishment only for those individuals who "knowingly or intentionally" inflict a serious bodily injury upon a child. These statutory words of intent effectively superseded the MPC-inspired words of intent we adopted in *Lima.*

Our review of *Lima* and the child abuse statute in place at the time of defendant's trial indicate that the trial justice's instruction on § 11–9–5.3, when viewed as a whole, adequately conveyed the existing law. Contrary to defendant's contention, we do not read *Lima* as classifying § 11–9–5.3 as a specific-intent crime. Instead, our concern in *Lima* was the possibility that the jury convicted the defendant without finding that she had acted with a *mens rea.* Additionally, although the distinction between specific- and general-intent crimes has been criticized,[3] the language of § 11–9–5.3 convinces us that it requires only a general intent to commit the prohibited act.

■■■ General-intent crimes require only the " 'intention to make the bodily movement which constitutes the act which the crime requires,' " 1 LaFave, *Substantive Criminal Law* § 5.2(e) at 355 (2d ed.2003), whereas specific-intent crimes most commonly involve the designation of "a special mental element which is required above and beyond any mental state required with respect to the *actus reus* of the crime." *Id.* at 354. Thus, when a statute defines an offense only by describing the unlawful act, without further referencing an intent

to do an additional act or to achieve a further consequence, the proscribed offense is a general-intent crime. *See Rowe v. State,* 974 P.2d 937, 939 (Wyo.1999). Because § 11–9–5.3 requires only that a person knowingly inflict a serious bodily injury upon a child and does not require that the person do some further act, attain some additional consequences, or have the subjective purpose to seriously injure the child, we conclude that it is a general-intent crime.[4]

In light of our analysis of *Lima* and our determination that first-degree child abuse is a general-intent crime, we are convinced that the trial justice did not err when he instructed the jury on § 11–9–5.3's intent requirement. He instructed the jury that it could convict defendant only if the jurors found that he acted "knowingly or intentionally," using the General Assembly's exact words of intent. The trial justice further clarified that acting "knowingly or intentionally" meant that defendant must have acted deliberately or purposely and not by way of accident or innocent mistake, thereby making clear that the jury could not convict defendant without finding that he had the required *mens rea.* Thus, we hold that the trial justice did not err when he instructed the jury on the intent element of first-degree child abuse.

2

**Instruction on Age Element**

■■■ The defendant argues that the trial justice violated his constitutional rights

---

**3.** *See State v. Doyon,* 416 A.2d 130, 134 (R.I. 1980); LaFave & Scott, *Handbook on Criminal Law* § 28 at 201–02 (1972).

**4.** It should be noted that the words "intentionally" and "knowingly" do not add a specific-intent element to a crime, and instead lend support to the conclusion that only a general-intent is required to commit the of-

fense. *Sharbuno v. Moran,* 429 A.2d 1294, 1296 (R.I.1981) ("[T]he Legislature recognized the need for including a general-intent element in the definition of the offense [of possession of a controlled substance]. This is evident in the use of the 'knowingly or intentionally' language in [G.L.1956] § 21–28–4.01(C).").

by directing a verdict on an element of the offense. As previously stated, at the close of trial, the trial justice instructed the jury that the first element of first-degree child abuse is that the victim must be a child under age eighteen. With respect to that element, the trial justice stated, "I charge you as a matter of law that that issue and that element has been proven, and there is no dispute on that element." He then reiterated his charge to the jury, stating "[n]ow, the first element I have indicated to you, you must accept as proven, proven already." At the side bar, defense counsel said,

"As to the age * * *, age still has to be proved.

" * * *

"There is still an element that has to be proven. They have to accept [the testimony concerning John Jr.'s age] to be proof beyond a reasonable doubt, so I object to that."

In response to defendant's objection, the trial justice stated, "[t]he date of birth was issued. There is no question in this Court's mind that the age of the child has been determined and fits the statutory scheme. They don't have to go through that element. It has been proven beyond a reasonable doubt."

The United States Supreme Court has said that the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." *United States v. Booker*, 543 U.S. 220, 230, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (citing *United States v. Gaudin*, 515 U.S. 506, 511, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)). Concerning this same notion, this Court has held that a jury instruction that relieves the state of its burden of proving each element of a crime charged beyond a reasonable doubt violates a defendant's

due process rights. *See State v. Hazard*, 745 A.2d 748, 751 (R.I.2000).

■ Nevertheless, a trial justice's error in removing an element of the crime from the jury's consideration does not automatically warrant reversal. Rather, this Court will affirm the conviction as long as it concludes the error was harmless beyond a reasonable doubt. *Hazard*, 745 A.2d at 752.

"Under this approach, 'an instructional omission, misdescription, or conclusive presumption can be subject to harmless-error analysis * * *: (1) where the defendant is acquitted of the offense on which the jury was improperly instructed * * *; (2) where the defendant admitted the element on which the jury was improperly instructed; and (3) where other facts necessarily found by the jury are the "functional equivalent" of the omitted, misdescribed, or presumed element.' " *Id.* at 753 (quoting *Neder v. United States*, 527 U.S. 1, 13, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)).

In this case, although it was error for the trial justice to instruct the jury that the child's age was proven beyond a reasonable doubt, that error was harmless. Throughout defendant's closing argument he repeatedly referred to the victim as a child. Furthermore, at trial, the victim's parents both testified to their son's date of birth, yet defendant did not object to this testimony and did not cross-examine or offer disputing evidence on that issue. The only time defendant objected to the classification of John Jr. as a child was at the close of trial when the trial justice rendered his jury instructions. Finally, throughout trial it was uncontroverted that the victim was treated by a pediatrician at a children's hospital. This evidence makes it inconceivable that a jury could have found this element unproven even absent the trial justice's erroneous instruction.

Because no prejudice resulted to defendant, we are of the opinion that the error was harmless beyond a reasonable doubt and does not require a new trial.

## C

### Family Court Jurisdiction

The defendant next argues that the Family Court lacked subject-matter jurisdiction over his case because the General Assembly did not specifically incorporate § 11–9–5.3 when granting a transfer or referral of jurisdiction from the Superior Court to the Family Court. He further argues that Family Court jurisdiction over his criminal trial should not have attached because defendant lacks the prerequisite family relationship necessary for the Family Court to exercise jurisdiction. We disagree.

"[S]ubject-matter jurisdiction is 'an indispensable requisite in any judicial proceeding,'" that this Court reviews *de novo. Newman v. Valleywood Associates, Inc.*, 874 A.2d 1286, 1288 (R.I.2005) (quoting *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1256 (R.I.2003)). Challenges to a court's subject-matter jurisdiction can be raised at any point in the proceedings and may not be waived by any party. *Bradford Associates v. Rhode Island Division of Purchases*, 772 A.2d 485, 488 (R.I.2001) (citing *Pine v. Clark*, 636 A.2d 1319, 1321 (R.I. 1994)).

This claim of error also presents a question of statutory interpretation, which we also review *de novo. Bucki v. Hawkins*, 914 A.2d 491, 495 (R.I.2007) (citing *Park v. Rizzo Ford, Inc.*, 893 A.2d 216, 221 (R.I.2006)). According to our rules of statutory construction, "[w]hen the language of a statute is clear and unambiguous, we must enforce the statute as written by giving the words of the statute their plain and ordinary meaning." *State v. Andujar*, 899 A.2d 1209, 1215 (R.I.2006) (quoting *Gem Plumbing & Heating Co. v. Rossi*, 867 A.2d 796, 811 (R.I.2005)).

Although defendant accurately recites the history of the Family Court's jurisdiction and correctly outlines the different statutes that either transfer jurisdiction to or vest original jurisdiction in the Family Court, defendant fails to appreciate the interplay between these statutes. The Family Court's jurisdiction derives only from those powers that are "expressly conferred upon it by statute." *Waldeck v. Piner*, 488 A.2d 1218, 1220 (R.I.1985). There are a number of statutes that transfer to or refer to the Family Court jurisdiction over specified matters. For example, G.L.1956 § 8–10–3(a), in relevant part, establishes the Family Court and gives it jurisdiction over "all petitions for divorce * * *, all motions for allowance, alimony, support and custody of children, * * * and such other equitable matters arising out of the family relationship." Likewise, § 8–10–4 transfers jurisdiction over certain criminal cases to the Family Court to protect and preserve the well-being of the family in the hope of reconciling the parties and reestablishing amicable family relations. *See also* § 8–10–5. Section 11–9–9 transfers jurisdiction over an additional group of cases to the Family Court by providing that "[t]he family court shall have exclusive original jurisdiction over any and all complaints and offenses set forth in §§ 11–9–1—11–9–8, 11–9–12, 11–9–14, and 11–9–15 * * *."

Reading these statutes together, it is clear that § 11–9–9 gives the Family Court exclusive jurisdiction over the offense with which defendant was charged. It is well established that "[t]he Legislature is 'presumed to know the state of existing law when it enacts or amends a

statute.'" *State v. DelBonis*, 862 A.2d 760, 768–69 (R.I.2004) (quoting *Simeone v. Charron*, 762 A.2d 442, 446 (R.I.2000)). Thus, the General Assembly demonstrated its unmistakable intent to have the Family Court exercise exclusive jurisdiction over the offenses set forth in § 11–9–5.1 when it placed § 11–9–5.3 between §§ 11–9–1 and 11–9–8. Additionally, it is noteworthy that § 11–9–5.3 involves injury to a child by a person who is legally entrusted with caring for that child, much like the other provisions in the subsection over which the Family Court has exclusive jurisdiction.

Also misguided is defendant's argument that the language of § 8–10–4 evidences the General Assembly's intent only to provide the Family Court with jurisdiction over crimes occurring within the family unit. Nothing in any of the statutes conferring jurisdiction upon the Family Court shows a desire to limit the authority of the Family Court exclusively to those crimes involving persons who share a familial relationship with the victim. Instead, the General Assembly has shifted to the Family Court jurisdiction over certain criminal

offenses against children, regardless of the relationship between the alleged perpetrator and the child. *See, e.g.*, §§ 11–9–1, 11–9–1.1, 11–9–1.3, 11–9–2, 11–9–4, 11–9–5, and 11–9–5.3.

For these reasons, we hold that the Family Court properly exercised jurisdiction over defendant's trial.

## D

### Temporary Assignment of the Chief Judge of the District Court to the Family Court

■ The defendant's next contention is that the temporary assignment of the chief judge of the District Court to the Family Court was not authorized by G.L.1956 § 8–15–3,[5] which sets forth the procedural requirements for a valid temporary assignment of a judge to another court. He alleges that the procedural requirements of § 8–15–3 were not followed here, rendering void any actions taken by the Chief Judge of the District Court in the Family Court. To support this contention, defendant points to G.L.1956 §§ 8–8–7,[6] 8–8–12,[7]

---

5. General Laws 1956 § 8–15–3 provides, in relevant part:

"In order to aid in the prompt disposition of judicial business, the chief justice shall have power to assign a judge of any trial court to sit in any other trial courts, subject to the approval of the presiding justice or the chief judge of both the sending and the receiving courts and with the consent of the judge to be assigned; the assignment to be for a designated period which designated period shall be determined by the chief justice subject to the approval of the presiding justice or the chief judge of both the sending and receiving courts and with the consent of the judge to be assigned * * *. The provisions of this section shall be interpreted and construed liberally for the purpose of accomplishing the purpose of this section. No other judge may be assigned to another court other than as provided in this section."

6. General Laws 1956, § 8–8–7, entitled "Judges—Temporary service in other courts," provides:

"(a) A district court judge shall devote full time to his or her judicial duties. He or she shall not practice law while holding office, nor shall he or she be a partner or associate of any person in the practice of law.

"(b) A district court judge shall be eligible to sit in any division, and, on assignment by the chief justice of the supreme court, shall be eligible to sit for temporary periods in the superior and family courts. A district court judge sitting in the superior or family court shall receive the same salary as a superior or family court judge would receive, and if the district court judge sits for only a portion of a two (2) week pay period in those courts, he or she shall be paid for the entire two (2) week period at the higher rate of pay.

and 8–15–3, as evidence that the statutory scheme created by the General Assembly distinguishes between associate judges and the chief judge of the District Court, thus rendering the chief judge ineligible for assignment to another trial court by the chief justice of the Rhode Island Supreme Court. We disagree.

Nothing in the plain language of § 8–15–3 indicates that the chief judge of the District Court is not also considered a judge of that court for the purposes of that statute. The fact that he has additional duties as the administrative head of a court, including "[holding] court in any division when he or she deems it necessary," § 8–8–12(a)(1), does not detract from our conclusion.

Additionally, § 8–15–3 provides that the power to assign judges "shall be interpreted and construed liberally" to accomplish the statute's goals. With this in mind, we see no reason to disqualify the chief judge of a court from the group of judges eligible for assignment simply because, if the chief judge were temporarily assigned to another court, approval by the chief judge and the assigned judge would be accomplished through one person's consent.

Furthermore, we find entirely unpersuasive defendant's argument that the chief judge of the District Court's presiding over a Family Court trial constituted an action by an unauthorized judge. The defendant likens the actions here to those of a retired judge who signed a search war-

rant without *de jure* authority. *See, e.g., State v. Nunez*, 634 A.2d 1167, 1170 (R.I. 1993). This simile is to no avail, however, as the chief judge of the District Court had *de jure* authority to preside over defendant's trial pursuant to his proper assignment under § 8–15–3.

Likewise, we find without merit defendant's assertion that the chief judge of the District Court's temporary assignment to the Family Court placed him in a position in which he impermissibly simultaneously held two incompatible judicial offices. The defendant cites *In re Advisory Opinion to the Governor*, 121 R.I. 64, 394 A.2d 1355 (1978), in support of this contention; however, this decision explicitly states that it does not involve the temporary assignment of a District Court judge pursuant to § 8–15–3 because such an assignment is solely "to aid in the prompt disposition of judicial business" and does not cause the appointed judge to take a new office or to change courts. *Advisory Opinion to the Governor*, 121 R.I. at 66 n. 3, 394 A.2d at 1356 n. 3.

Therefore, we conclude that the chief judge of the District Court's temporary assignment to the Family Court was valid; he was properly assigned under § 8–15–3.

### E

### Jury Selection

▬ The defendant next challenges the jury selection process. According to de-

---

"(c) A district court judge, subject to the approval of the chief justice of the supreme court, the presiding justice of the superior court and the chief judge of the district court, may serve on the superior court calendar to preside over district court de novo appeals. A district court judge sitting in the superior court presiding over district court de novo appeals shall receive the same salary as a superior court judge would receive."

7. Section 8–8–12, entitled "Duties of chief judge," provides, in relevant part:

"(a) The chief judge shall be the administrative head of the district court and shall be responsible for its operation and the efficient use of its manpower. To this end he or she shall:

"(1) Hold court in any division when he or she deems it necessary;

"(2) Assign judges to hold court in the various divisions[.]"

fendant, a Superior Court jury pool was used to qualify jurors for the matter that ultimately proceeded in the Family Court. The defendant maintains that this process was improper because the Family Court, in conjunction with the jury commissioner, was obligated to fashion its own jury pool. A review of the record, however, reveals that the first time defendant raised this argument was in his brief to this Court.

This Court has held that a defendant seeking to challenge the constitutionality of a grand or petit jury must file a pretrial motion pursuant to Rule 12(b)(2) and (3) of the Superior Court Rules of Criminal Procedure. *State v. Dionne*, 442 A.2d 876, 882 (R.I.1982); *State v. Caron*, 423 A.2d 823, 827 (R.I.1980) (citing *State v. O'Coin*, 417 A.2d 310, 313 (R.I.1980)). In *O'Coin*, we articulated that this requirement is intended to ensure that defects are cured "before the court, the witnesses, and the parties have gone through the burden and expense of a trial." *O'Coin*, 417 A.2d at 313.

In this case, defendant's failure to follow this well-established procedure constitutes a waiver and precludes his argument to this Court.

### F

### Applicability of § 11–9–5.3(f)

The defendant's final argument is that the trial justice erred by imposing an enhanced sentence under § 11–9–5.3(f) without requiring the jury to find that the victim was five years old or younger.

Pursuant to § 11–9–5.3(f):

"Any person who commits first degree child abuse on a child age five (5) or under shall not on the first ten (10) years of his or her sentence be afforded the benefit of suspension or deferment of sentence nor of probation for penalties provided in this section; and provided further, that the court shall order the

defendant to serve a minimum of eight and one-half (8½) years or more of the sentence before he or she becomes eligible for parole."

Despite defendant's argument, there is no indication in the record that the trial justice relied upon § 11–9–5.3(f) in sentencing defendant. Rather, the trial justice sentenced defendant to twenty years, with twelve years to serve and eight years suspended, with probation. At no time did the trial justice restrict the time before which defendant becomes eligible for parole. Because a judgment of conviction is final and is to be given effect in accordance with its terms, it is clear that defendant's eligibility for parole was not limited. *See Carter v. Romano*, 426 A.2d 255, 256 (R.I. 1981) (quoting *Mitchell v. Association of the Bar of New York*, 40 N.Y.2d 153, 386 N.Y.S.2d 95, 351 N.E.2d 743, 746 (1976)) ("[A] judgment of conviction is entitled [to] * * * respect as a final judgment on the merits unless and until reversed upon appeal.").

Finally, even if the trial justice relied upon § 11–9–5.3(f), but failed to articulate such reliance at sentencing, his error, if any, was harmless beyond a reasonable doubt. As was detailed *supra*, the victim's age was not disputed at trial and defendant had ample opportunities to object to testimony of the state's witnesses regarding the victim's date of birth.

Therefore, we conclude that the defendant's argument is untenable.

### Conclusion

For the reasons set forth herein, the judgment of the Family Court is affirmed. The record shall be remanded to the Family Court.