## COMMONWEALTH VS. RONALD LEFTWICH.

Hampden. November 2, 1999. - March 7, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Practice, Criminal,* Instructions to jury, Judicial discretion, Deliberation of jury, Capital case. *Joint Enterprise. Evidence,* Joint enterprise, Prior conviction, Judicial discretion, Prior misconduct, State of mind, Motive, Verbal completeness. *Jury and Jurors.*

Evidence at the trial of an indictment for murder in the first degree was sufficient to warrant the submission of the case to the jury on the theories that the defendant was either a principal or a joint venturer. [868-869]

At a 1998 murder trial, there was no abuse of discretion in the judge's pretrial ruling that, if the defendant chose to testify, the Commonwealth could impeach him with evidence of a 1978 conviction for armed burglary, which was properly admissible under G. L. c. 233, § 21. [869-870]

At a murder trial, evidence of the defendant's prior misconduct and consequent strained relationship with the victim was properly admitted as relevant to prove motive and the victim's state of mind. [870-871]

At the trial of an indictment for murder in the first degree, the judge did not err in admitting in evidence a redacted version of the defendant's statement to police, where the redacted portions did not qualify for admission under the doctrine of verbal completeness or were hearsay, irrelevant, or harmful to the defense. [871-872]

At a murder trial, the judge did not err or abuse his discretion in discharging a deliberating juror pursuant to G. L. c. 234, § 26B, and replacing her with another, without a medical examination, where the record adequately supported the conclusion that the particular juror was unable to continue her service. [872-874]

INDICTMENT found and returned in the Superior Court Department on December 18, 1996.

The case was tried before *Constance M. Sweeney,* J.

*Charles K. Stephenson* for the defendant.

*Elizabeth Dunphy Farris,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. On February 4, 1998, the defendant was convicted by a jury of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. Represented by

new counsel, he appeals from his conviction, arguing that the judge erred by (1) instructing the jury on joint venture; (2) ruling the defendant could be impeached by a prior conviction; (3) admitting as evidence of motive the defendant's misuse of a company credit card and the victim's state of mind; (4) admitting a redacted version of the defendant's signed statement to the police; and (5) discharging and replacing a deliberating juror. We have considered these arguments and have reviewed the entire record pursuant to G. L. c. 278, § 33E. We affirm the conviction.

We summarize the evidence in the light most favorable to the Commonwealth. See, e.g., *Commonwealth* v. *Gilbert*, 423 Mass. 863, 864 (1996). The defendant and the victim, Bishop Martin Henri, met in 1993 or 1994 when the defendant was serving a sentence in a Ludlow jail and the victim was performing religious services there. The victim invited the defendant to stay with him at "the monastery," the Brothers of Bethany Holy Trinity Church, and the defendant had been living in the guest house on the grounds since his release date.

At approximately 7 A.M. on December 3, 1996, Audrey Machnik, who attended services every day, arrived at the monastery in order to attend the 7:15 A.M. mass to be celebrated by the victim. As she paused outside the chapel, she was approached by the defendant who told her that some heating equipment had been left on and asked her if she knew where the victim was. Machnik replied that she did not. Machnik and the defendant were joined by another regular attendee of services, and the three began to search the grounds for the bishop. On the ground, near the trailer that was the victim's residence, they found the victim's broken glasses, without which he could not see. The three decided to call the police, and the defendant telephoned 911.

The Massachusetts State trooper who arrived at the monastery observed torn up ground and what appeared to be blood near the victim's trailer. He also saw blood spots and a blood trail on a path in front of the victim's trailer. Shortly thereafter, the trooper was notified that a body had been discovered about three miles up the road.

The body, positively identified as the victim later that afternoon, was found in a ditch about eighteen feet from the road, and there was a large pool of blood just before the ditch. The medical examiner testified that the victim had been killed

in the early morning of December 3, between midnight and 2 A.M., and that the cause of death was multiple blunt force trauma to the head and multiple sharp force injuries to the chest. The head injuries, which had been inflicted by a hammer, tire iron, or other implement with similar firmness, and which caused severe multiple fractures of the victim's skull and face, had been inflicted first, about forty-five to sixty minutes before the victim's death. The victim had then been dragged across sand, gravel, or asphalt while alive, and finally, about fifteen minutes before the onset of death, had been stabbed five times in the upper chest.

After they had been notified of the discovery of the body, police officers arranged for those present at the monastery to give written statements. In his statement, the defendant said he had returned to the monastery grounds from work on December 2 around 4:30 P.M., had seen the victim shortly thereafter, but had not seen him after that time. The defendant also stated that he had been on the grounds all evening until he went to bed around 11 P.M., and that he did not hear anything after that. The defendant further stated that he had awoken on December 3 around 6:15 A.M., gone to the main house, and put in a load of laundry. It was then that he had noticed the heating equipment had been left on.

Not long after, the police learned that there was blood inside the defendant's van, and the officers asked the defendant for the keys. The defendant was somewhat evasive and gave conflicting answers about their location. The defendant was then asked to give a second statement regarding the keys to the van. Shortly thereafter, police tests revealed the presence of the defendant's fingerprint in the blood in the van.

At the police barracks, the defendant was read the Miranda warnings. When questioned about the location of the van keys, the defendant first stated that the keys were in the kitchen of the main house. When told the keys were not there, the defendant told the officers the keys were on the ironing board. The defendant then stated, "You'll probably find your killer if you find those keys." When one of the officers asked the defendant if there was any reason why his bloody fingerprint would be in the van, the defendant responded, "Nope, not my prints, not my prints." The defendant also said, "Now you're playing with me," and sat back and crossed his arms. The defendant then stated he had some information that could clear him. When

asked what that information was, the defendant said, "Now I'm playing with you." A few minutes later, the defendant was arrested.

Immediately after the defendant's arrest, the State chemist performed a chemical screening test for the presence of blood, and portions of the defendant's hands, forearms, and upper arms tested positive. During the subsequent booking process, when the defendant was asked to remove all items from his pockets, he stuck his hands in his pockets. After repeated requests, the defendant pulled the key to the van out of his pocket. As the defendant took the key out of his pocket, he said, "I did not kill the bishop. I only helped dump his body, get rid of his body."

The Commonwealth also produced evidence that the victim's blood was on the defendant's watch and shoes, on the lid of the monastery's washing machine, in several areas of the defendant's van, and on the outer rim of one of the wheelbarrows on the monastery grounds. Most of the clothing surrendered by the defendant tested positive for the presence of blood.

1. *Joint venture.* Over the defendant's objection, the judge instructed the jury that they could convict the defendant either as a principal or joint venturer. The defendant contends the issue of joint venture should not have been submitted to the jury because there was no evidence the defendant conspired with another. We conclude the evidence presented at trial was sufficient.

In order to warrant submitting the theory of joint venture to a jury, there must be evidence sufficient to permit a finding beyond a reasonable doubt that the defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Ortiz,* 424 Mass. 853, 856 (1997), quoting *Commonwealth* v. *Bianco,* 388 Mass. 358, 366, *S.C.,* 390 Mass. 254 (1983). See *Commonwealth* v. *Plunkett,* 422 Mass. 634, 640 (1996) ("there must be evidentiary support for each theory of guilt on which the judge tells the jury they may find the defendant guilty"); *Commonwealth* v. *Brooks,* 422 Mass. 574, 581 (1996) (inferences need only be reasonable and possible).

Here, the Commonwealth presented evidence that the

defendant said he did not kill the victim but only helped dump the body; that one of the spots of blood on the interior of the van was a mixture of the victim's and another's genetic material, but that the defendant was excluded as a donor from the blood; that the blood on the defendant's shoes was a mixture of the victim's and one or two others' genetic material, but not the defendant's; that there were unidentified fingerprints in the van; and that the victim had received fatal injuries at both the monastery and the dump site. From this evidence, the jury could reasonably infer that another had been present and involved in the murder of the victim, either as principal or joint venturer. The judge was therefore correct to instruct the jury on joint venture liability. Cf. *Commonwealth* v. *Green*, 420 Mass. 771, 779-780 (1995) (new trial required because judge instructed on joint venture when Commonwealth had presented case solely on theory that defendant was principal and evidence pointed solely to defendant's role as principal).

2. *Use of prior convictions.* During a pretrial hearing, the judge ruled that, if the defendant chose to testify, the Commonwealth could impeach him with evidence of a 1978 conviction for armed burglary. The defendant argues that this was prejudicial error because (1) the conviction was just a few days from being time-barred under G. L. c. 233, § 21; and (2) it had minimal probative value relative to his truthfulness, i.e., armed burglary is breaking and entering with the intent to commit any felony, in this case, an assault. We conclude there was no abuse of discretion.

If a prior conviction is within the prescribed time limits of G. L. c. 233, § 21, "[t]he decision whether to admit evidence of prior convictions to impeach a witness involves an exercise of discretion by the judge. *Commonwealth* v. *Knight*, 392 Mass. 192, 194 (1984). The judge must balance the danger of unfair prejudice which can result from the admission of evidence of prior convictions against the probative value of the evidence for the purpose of impeachment. *Commonwealth* v. *Maguire*, 392 Mass. 466, 470 (1984)." (Footnote omitted.) *Commonwealth* v. *Fano*, 400 Mass. 296, 302 (1987). Generally, in order for the prejudicial effect to outweigh the probative value of prior conviction evidence, the "prior conviction must be *substantially similar* to the charged offense" (emphasis added). *Commonwealth* v. *Drumgold*, 423 Mass. 230, 250 (1996).

Here, the conviction of armed burglary was within the statu-

tory time limit and was thus subject to the judge's discretion. The record indicates that the judge engaged in the required balancing and exercised her discretion, excluding two and admitting one of the defendant's prior convictions.[1] There was no abuse of discretion. See *Commonwealth* v. *Maguire, supra* at 470. See also *Commonwealth* v. *Fano, supra* at 300, 304 (prior convictions of manslaughter, breaking and entering, receiving stolen property, escape, armed robbery while masked, and possession of burglarious implements were not substantially similar and could be used to impeach defendant in trial for murder in first degree); *Commonwealth* v. *Kowalski,* 33 Mass. App. Ct. 49, 50 (1992) (prior convictions of dissimilar crimes which did not reflect on defendant's truth-telling abilities could be used to impeach).

3. *Evidence of prior misconduct and the victim's state of mind.* Over the defendant's objection, the Commonwealth was allowed to introduce, as evidence of motive, the testimony of the defendant's employer. The victim had been good friends with the employer and had introduced the defendant to him. The employer and his general manager testified that, in the month prior to the murder, the defendant had improperly charged $1,700 in cash advances on a company credit card in order to gamble. They also testified that, a few days before the murder, the defendant admitted that he had lied and that he could not repay the money. The defendant also told them that he had talked to the victim about the issue, that the victim was upset because the victim had helped the defendant get the job, and that the victim had offered to repay the money. The employer also testified about a conversation he had with the victim on December 1, at the end of which the victim stated that he knew about the money. When the employer mentioned the amount of money, the victim appeared surprised.

The defendant argues that this evidence fell short of the Commonwealth's offer of proof, failed to establish a credible motive, and was therefore irrelevant and inflammatory. We agree with the defendant that the evidence fell short of the Commonwealth's offer of proof. However, we do not agree that the evidence was irrelevant.

---

[1]On July 10, 1978, the defendant pleaded guilty in Nantucket Superior Court to a series of related charges. Of the three convictions which arose from the plea and which met the time limits of G. L. c. 233, § 21, the judge excluded the convictions of assault with intent to murder and assault with intent to rape.

Evidence of motive is generally admissible although the Commonwealth is not required to prove motive. See, e.g., *Commonwealth* v. *Brooks*, 422 Mass. 574, 581 (1996); *Commonwealth* v. *Weichell*, 390 Mass. 62, 73 (1983), cert. denied, 465 U.S. 1032 (1984). Evidence of prior misconduct is admissible to prove motive, as is evidence of the victim's state of mind, but only if there is evidence that the defendant was aware of the victim's state of mind. See *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997); *Commonwealth* v. *Robles*, 423 Mass. 62, 68 (1996); *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). The defendant makes no claim that the defendant was unaware of the victim's state of mind.

The evidence established that the defendant had stolen money from his employer and that the theft had caused a strained relationship between the victim and the defendant, suggesting a possible motive. See *Commonwealth* v. *Weichell*, *supra* at 74, quoting *Commonwealth* v. *St. Germain*, 381 Mass. 256, 271 (1980) (evidence that "merely suggests rather than 'clearly shows' a motive for the crime may still be ruled admissible"). It was for the jury to determine the credibility and persuasiveness of the evidence. Any potential prejudice of the evidence was minimized as the judge gave limiting instructions when the evidence was introduced and again during the final charge.

4. *Admission of the defendant's redacted statement.* At trial, a redacted version of the defendant's statement to the police was admitted in evidence. The redactions were made pursuant to the Commonwealth's motion and, with one exception, with the defendant's approval. The defendant now argues that, under the doctrine of verbal completeness, the Commonwealth should have been required to offer the statement in its entirety or forgo use of it. We conclude there was no abuse of discretion.

Under the "limited" verbal completeness rule applied in this Commonwealth, "whenever the statements, declarations or admissions of a party are made subjects of proof, all that was said by him at the same time and upon the same subject is admissible in his favor, and the whole should be taken and considered together." *Commonwealth* v. *Watson*, 377 Mass. 814, 827 (1979), quoting *Commonwealth* v. *Keyes*, 11 Gray 323, 324 (1858). See *Commonwealth* v. *Hamilton*, 411 Mass. 313, 322 (1991). However, "[t]he defendant cannot compel the admission of an entire statement simply because the Commonwealth

offers a part of it. Rather, it is necessary that the portion of the statement that the defendant seeks to introduce qualify or explain the segment introduced by the Commonwealth." (Citation omitted.) *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 479, cert. denied sub nom. *Pirotta* v. *Massachusetts*, 479 U.S. 838 (1986).

The portions of the defendant's statement offered by the Commonwealth and admitted by the judge dealt with the relationship between the defendant and the victim, and with the defendant's whereabouts, actions, and attire on the night of December 2 through the morning of December 3. The redacted portions of the defendant's statement do not qualify, explain, contradict, or put into context any of the segments introduced by the Commonwealth, and the jury were not likely to be misled by the redaction, and the statements do not qualify for admission under this doctrine.[2] To hold otherwise would extend the " 'completeness rule' to an illogical conclusion," and would "permit a defendant to make a statement containing an admission and then load it with any amount of self-serving statements," admissible at his option. *Commonwealth* v. *Watson*, *supra* at 833. Additionally, many of the statements contained multiple levels of hearsay, were irrelevant to the issues at trial, and some redactions even benefited the defendant. There was, therefore, no error in redacting portions of the defendant's statement before admitting it into evidence. See *id.* at 827, quoting *Cusick* v. *Whitcomb*, 173 Mass. 330, 331 (1899).

5. *Discharge of deliberating juror.* Prior to the start of the third day of deliberations, one of the deliberating jurors contacted a court officer and insisted on speaking to the judge. During two subsequent colloquies, done in the presence of counsel, the juror informed the judge that she had spoken with her physician the prior afternoon because she was having difficulty with stress, that she had been having difficulty breathing due to the stress, that she did not think she could continue to deliberate or be a fair juror, and that if she were to return to the deliberations, she feared the verdict would not be fair. The

___

[2] The subject matter of the portions of the defendant's statement that were redacted may be grouped and characterized as follows: (1) the defendant was serving a sentence of from ten to twenty years for a sex offense when he met the victim; (2) references to and hearsay information about two individuals who formerly lived at the monastery and their relationship with the victim; and (3) references to a married woman with whom the defendant was involved or to conversations he had with her.

judge noted at various points that the juror was very emotionally distraught, was shaking "from head to toe," and was clearly under extraordinary stress, and that she was concerned about the juror's mental state. The judge determined the juror was unable to continue based on the juror's statement that she could not continue to deliberate in a fair manner and because of the physical manifestations of stress that the judge had observed. The defendant timely objected.

General Laws c. 234, § 26B, provides for the substitution of a deliberating juror if "a juror dies, becomes ill, or is unable to perform his duty for any other good cause shown to the court." See Mass. R. Crim. P. 20 (d) (3), 378 Mass. 891 (1979). Before replacing a deliberating juror, "the judge should hold a hearing and be fully satisfied that there is a meritorious reason why a particular juror should not continue to serve. . . . The judge then should consider whether, in view of all the circumstances, an alternate juror should be substituted." *Commonwealth* v. *Haywood*, 377 Mass. 755, 769-770 (1979). Trial judges have discretion to determine that the facts show an inability to perform the functions of a juror, and that inability must be supported by the facts in the record. See *Commonwealth* v. *Connor*, 392 Mass. 838, 846-847 (1984), quoting *People* v. *Collins*, 17 Cal. 3d 687, 696 (1976), cert. denied, 429 U.S. 1077 (1977).

The defendant argues that the judge's determination that the juror was unable to continue deliberations was based on insufficient evidence because the judge should have summoned the juror's physician or a court psychologist to examine the juror. The defendant also argues that the juror's illness was not sufficiently distinct from the stress caused by the deliberations. We conclude the record adequately supports the conclusion that this juror was unable to continue her service, and the judge properly exercised her discretion in discharging and replacing the juror.

First, while it may often be important to have a medical professional examine a juror who complains of emotional illness, there is no requirement that one be summoned to render an opinion about the ability of a juror to continue to serve. See *Commonwealth* v. *Connor, supra* at 846 (judge may conclude without assistance of medical personnel, in appropriate case and after appropriate hearing, that juror is unable to continue). Further, it is true that jurors should not be excused for reasons related to "the issues of the case or . . . the juror's relationship to the other jurors," *Commonwealth* v. *Daughtry*, 417 Mass.

136, 146 (1994), and there was some indication that the juror's extreme emotional distress was, at least in part, due to the deliberations. We do not, however, require jurors to serve at their peril. If a deliberating juror is determined to be experiencing severe emotional or mental distress, well beyond that level of distress that often accompanies deliberations, it is within the trial judge's discretion to discharge that juror after consideration of all the circumstances. There is nothing in the record to indicate that the jury were at an impasse, or that the juror's statements were "euphemisms" for the fact that the juror was "persistent in asserting a minority position during deliberations." *Commonwealth v. Connor, supra* at 846. There was no error.[3]

6. *Section 33E review.* Pursuant to our duties under G. L. c. 278, § 33E, we have reviewed the entire record.[4] We find nothing that compels us to exercise our discretion to disturb the jury's verdict, either by reducing the verdict or granting a new trial.

*Judgment affirmed.*

---

[3]Compare *Commonwealth v. Connor,* 392 Mass. 838, 846 (1984) (new trial ordered because judge discharged deliberating juror without holding hearing and without making findings of good cause — juror's mere assertion of inability to abide by oath does not establish good cause), and *Commonwealth v. Webster,* 391 Mass. 271, 275 (1984) (discharge of deliberating juror after coercive and confrontational colloquy held in view of other jurors and during which judge expressed his view of the evidence created prejudice and required new trial), with *Commonwealth v. Daughtry,* 417 Mass. 136, 146 (1994) (discharge of deliberating juror based on need to undergo medical test not error where judge held hearing and determined juror had grave medical condition and needed test, juror informed judge before empanelment about test, and it was clear that juror's impairment was not due to deliberations but to prior condition), and *Commonwealth v. Haywood,* 377 Mass. 755, 768 (1979) (no error where judge followed proper procedure in discharging and replacing deliberating juror who became physically ill during deliberations).

[4]Although not explicitly addressed in the text, we have also considered the arguments raised by the defendant acting pro se.