# United States Court of Appeals
## For the First Circuit

No. 06-2583

RONALD LEFTWICH,

Petitioner, Appellant,

v.

MICHAEL T. MALONEY,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Boudin, Circuit Judge,
O'Connor,[*] Associate Justice (Ret.),
and Selya, Senior Circuit Judge.

David A.F. Lewis for appellant.
Jessica V. Barnett, Assistant Attorney General, Commonwealth
of Massachusetts, with whom Martha Coakley, Attorney General, was
on brief, for appellee.

July 2, 2008

---

[*]Hon. Sandra Day O'Connor, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SELYA**, <u>**Senior Circuit Judge**</u>.  In this appeal, a habeas petitioner challenges his state-court conviction and ongoing detention for the murder of a prelate.  The appeal poses only a single question: Was the evidence sufficient, in terms of the Due Process Clause, to ground a conviction for first-degree murder either as a principal or as a joint venturer?  The district court answered this question in the affirmative, and so do we.

Because this appeal involves a challenge to evidentiary sufficiency, we rehearse the facts in the light most compatible with the jury's verdict, consistent with record support.  <u>See</u> <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 319 (1979).  Moreover, in a wrinkle peculiar to the exercise of habeas jurisdiction, we grant a presumption of correctness to factual determinations made by the state courts.  <u>See</u> 28 U.S.C. § 2254(e)(1).

The saga begins at the same place it ends — a prison.  While incarcerated at the Hampden County House of Corrections, petitioner-appellant Ronald Leftwich met Bishop Martin Henri.  The bishop, whose charismatic ministry extended to the inmates there, arranged for the petitioner to join his flock when released from prison.  As part of that arrangement, the petitioner took up residence on the grounds of the Brothers of Bethany Holy Trinity Church in Brimfield, Massachusetts.

Initially, the petitioner performed landscape maintenance in exchange for bed and board.  He soon assumed additional duties

and, with the bishop's assistance, obtained an additional job with an independent employer (Strawberry Productions).

Apart from his killer or killers, the last person to see Bishop Henri alive was a parishioner who, on the evening of December 2, 1996, observed him walking toward his residence on the church grounds. The next morning, the bishop could not be located. The bishop's nearsightedness was well-known and, after his broken glasses were found, parishioners called the police. In short order, state troopers discovered an area of blood-soaked soil and repastinated turf close to the bishop's residence.

The search widened. Later the same morning, the troopers discovered the bishop's lifeless body in a ditch some three miles away. The corpse showed signs of both blunt trauma to the head and stab wounds to the chest. A medical examiner would later testify that Bishop Henri had died sometime between midnight and 2:00 a.m., and that the stab wounds (which had punctured his left lung) had been inflicted roughly an hour after the blunt trauma wounds and while the bishop was still alive.

The petitioner gave a statement to the police in which he asserted that he had last seen the bishop at 5:45 p.m. on December 2; that he (the petitioner) had retired around 11 p.m.; that he had awakened at 6:15 a.m.; and that he had begun the day by doing a load of laundry. When traces of blood were discovered on the exterior of the petitioner's van, the police asked for the keys.

At that point the petitioner became evasive and gave the officers several false leads (e.g., suggesting that the keys might be in the kitchen or on the ironing board). When the police expressed frustration, the petitioner gnomically responded: "You'll probably find your killer if you find those keys."

The petitioner's arrest and the giving of Miranda warnings, see Miranda v. Arizona, 364 U.S. 436, 444 (1966), followed. When the petitioner emptied his pockets during booking, the missing keys appeared. He immediately protested his innocence with respect to the murder while at the same time inculpating himself in the disposal of the body: "I did not kill the bishop. I only helped dump his body, get rid of his body."

A Hampden County grand jury indicted the petitioner for first-degree murder. At trial, the prosecution's case was largely circumstantial. The petitioner's statements were entered into evidence, but he did not testify.

The petitioner moved for a directed verdict at the close of the prosecution's case in chief and again at the close of all the evidence. The trial justice denied both motions. She instructed the jurors that they could find the petitioner guilty on either of two theories: as a principal or, alternatively, as a joint venturer.[1] The jury returned a general verdict declaring the

---

[1]The latter theory is "essentially an aiding and abetting concept." Stewart v. Coalter, 48 F.3d 610, 614 (1st Cir. 1995); see Commonwealth v. Ortiz, 679 N.E.2d 1007, 1009 (Mass. 1997)

-4-

petitioner guilty of first-degree murder. The jurors made no special finding as to which theory of guilt guided their thought processes. The trial justice imposed a sentence of life imprisonment.

On direct appeal, the Massachusetts Supreme Judicial Court (SJC) affirmed. See Commonwealth v. Leftwich, 724 N.E.2d 691 (Mass. 2000). In its opinion, the SJC rejected a multitude of contentions, including a challenge to the sufficiency of the evidence. The court concluded by stating that its review of the entire record pursuant to Mass. Gen. Laws ch. 278, § 33E, revealed no reason to disturb the verdict. See Leftwich, 724 N.E.2d at 699.

Eleven months later, the petitioner seasonably repaired to the federal district court in search of a writ of habeas corpus. He named as the respondent the commissioner of the Massachusetts Department of Correction (for ease in exposition, we shall treat the Commonwealth of Massachusetts as the real party in interest). The petitioner advanced seven claims of error. The district court rejected them all. See Leftwich v. Maloney, No. 01-10284, 2006 WL 2883346, at *8 (D. Mass. Oct. 5, 2006).

Only the disposition of the petitioner's sufficiency challenge is pertinent here. The district court concluded that the SJC had not addressed the sufficiency of the evidence under the relevant federal standard and, therefore, reviewed that claim de

_____

(setting out the elements of joint-venture felonies).

-5-

novo. See id. at *6. The court nevertheless reached the same conclusion as had the SJC and, in doing so, employed much the same reasoning. In due course, the district court granted a certificate of appealability limited to this claim. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)(1).

The district court's denial of the insufficiency claim turns on a purely legal determination and, thus, engenders de novo review. Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007). We have construed its certificate to encompass the broad question of whether the evidence presented at trial was constitutionally sufficient to convict the petitioner either as a principal or as a joint venturer. It is to this question that we now proceed.

In criminal cases, the constitutional benchmark for evidentiary sufficiency is familiar. "If the evidence presented, taken in the light most flattering to the prosecution, together with all reasonable inferences favorable to it, permits a rational jury to find each essential element of the crime charged beyond a reasonable doubt, then the evidence is legally sufficient." United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995) (citing Jackson, 443 U.S. at 319). In conducting a sufficiency analysis, however, some degree of intellectual rigor is required; a reviewing court should not give credence to "evidentiary interpretations and illations that are unreasonable, insupportable, or overly

-6-

speculative."  United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995).

Once a state court has passed upon the merits of a sufficiency challenge in accordance with the appropriate federal constitutional standard, a federal habeas court's review becomes incrementally more nuanced.  Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, the state court's application "of clearly established Federal law, as determined by the Supreme Court of the United States," will trigger issuance of the writ only if it constitutes "an unreasonable application" of that law.  28 U.S.C. § 2254(d)(1). Thus, "[t]he habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted."  Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001).  In such a situation, then, the state court's decision is not vulnerable unless it evinces some increment of incorrectness beyond mere error.  McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc).

Here, however, there is a threshold question about whether the state court in fact passed upon the merits of the federal constitutional claim; the SJC addressed the sufficiency of the evidence supporting the conviction exclusively in the vocabulary of state law and precedent.  That leads to a further refinement.  We have held that a state-court adjudication of an

-7-

issue framed in terms of state law may receive section 2254(d)(1) deference so long as the state standard is at least as protective of the defendant's rights as its federal counterpart. Thus,

> [i]f there is a federal or state case that explicitly says that the state adheres to a standard that is more favorable to defendants than the federal standard (and it is correct in its characterization of the law), we will presume the federal law adjudication to be subsumed within the state law adjudication.

Id. at 35; see White v. Coplan, 399 F.3d 18, 23 (1st Cir. 2005) (explaining that a federal habeas court may "infer that the federal claim was considered if the state court rejects a counterpart state claim and then cites to a case holding that the federal constitution provides no greater protection").

In addressing the sufficiency of the evidence undergirding the joint venture theory, the SJC relied on a series of Massachusetts precedents harking back to its seminal decision in Commonwealth v. Latimore, 393 N.E.2d 370 (Mass. 1979). Because the Latimore court adopted the governing federal constitutional standard as the Massachusetts standard for sufficiency of the evidence challenges, see id. at 374 (citing Jackson, 443 U.S. at 318-19), we can securely reason that in scouring the record for Latimore error and finding none the SJC effectively answered the federal constitutional question.

The same cannot be said about the SJC's treatment of the petitioner's guilt qua principal. The SJC did not review that

aspect of the case on the merits but, rather, solely in pursuance of its statutory duty to guard against miscarriages of justice. See Mass. Gen. Laws ch. 278, § 33E (empowering the court to grant relief "if satisfied that the verdict was against the law or the weight of the evidence"). The SJC acts under this statute with the benefit of substantial discretion, equivalent to that of a trial judge adjudicating a motion for a new trial. See Commonwealth v. Hurley, 461 N.E.2d 754, 757 (Mass. 1984); see also Commonwealth v. Pring-Wilson, 863 N.E.2d 936, 947 & n.14 (Mass. 2007). Given that discretion, its refusal to set aside a verdict under section 33E does not necessarily denote that it actually decided the Jackson issue. With respect to that theory, then, we cannot grant the SJC's decision the deference that section 2254(d)(1) envisions.[2] Rather, de novo review obtains on that issue.

This brings us to a crossroads. On federal habeas review of a state-court conviction that potentially rests on dual theories of guilt, the writ will not issue as long as one of the two theories is adequately supported. See Brown v. Maloney, 267 F.3d 36, 44 (1st Cir. 2001). This construct stems from applicable federal law, which holds that when parallel theories are submitted to a criminal jury antecedent to a general verdict of guilty, the

---

[2]This conclusion is fortified by what happened here. The SJC did not explicitly address the sufficiency of the evidence as to the petitioner's guilt qua principal; it merely said that "nothing . . . compels us to exercise our discretion to disturb the jury's verdict." Leftwich, 724 N.E.2d at 699.

verdict should be upheld as long as there is sufficient evidence to validate either of the theories presented. United States v. Griffin, 502 U.S. 46, 60 (1991); United States v. Moran, 393 F.3d 1, 14-15 (1st Cir. 2004). We opt here to start by addressing the sufficiency of the evidence supporting the petitioner's guilt as a principal.[3]

Massachusetts defines first-degree murder in pertinent part as "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty." Mass. Gen. Laws ch. 265, § 1. Although the petitioner baldly proclaims that he does not concede any element of the crime, he makes no developed argumentation about anything other than the killer's identity. Consequently, we consider any other challenges to be foregone. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

As to the killer's identity, the petitioner argues that the evidence supported no more than a finding that he was an accessory after the fact. The lone issue, therefore, is whether

---

[3]Because that theory is adequately supported, see text infra, our analysis ends there. We add parenthetically that the evidence also appears sufficient to sustain the petitioner's conviction as a joint venturer. No useful purpose would be served, however, by providing a detailed exegesis of the reasoning on which this conclusion rests.

the evidence sufficed to show that the petitioner was a principal rather than a mere accessory, i.e., that it was he who killed (or participated in killing) the bishop.

The petitioner's confession is central to this inquiry. While his direct admission is limited to a role in disposing of the body, that admission places him at the ditch. There was credible evidence from which the jury could have found that the murder occurred there. Given those two facts, a mass of other information suggested that it was the petitioner who delivered the stab wounds and that his carefully circumscribed admission comprised a deliberate minimization of his role in the crime. No more is exigible to ground a conviction for first-degree murder.

We discuss first the evidence indicating that Bishop Henri perished at the ditch. To begin, a medical examiner testified that the stab wounds preceded the bishop's demise by fifteen minutes at the most and that, while still alive, the bishop sustained abrasions consistent with being dragged across the terrain adjacent to the ditch. Finally, a dense pooling of blood near the ditch suggested that the bishop was stabbed there.

In view of the distance between the church and the ditch, a rational jury could have inferred from this evidentiary array that the fatal wounds were inflicted near the ditch. Relatedly, this evidence entitled the jury to infer that the petitioner could not have participated in the disposal of the body without also

-11-

having been present during the fatal stabbing.  On this rationale, then, the petitioner's acknowledged role in the dumping of the body became powerful evidence of his involvement in the murder itself.

The physical evidence at the church grounds was consistent with this conclusion.  For instance, round blood droplets on the flagstone walkway were difficult to reconcile with a hemorrhaging body being dragged across that walkway.  There was, moreover, evidence from which the jury could have concluded that the wounded bishop had been moved by wheelbarrow at the church site, not dragged.

The inference of the petitioner's likely involvement in the murder was strengthened by proof that on the day of the killing the police recovered a Leatherman tool from him.[4]  According to expert testimony presented at the trial, the tool's length and width were consistent with the dimensions of the bishop's chest wounds.  Although the petitioner counters that the weapon itself lacked traces of blood, the absence of blood seems to be of dubious probative value in light of other evidence that the petitioner embarked on a wide-ranging cleaning spree shortly before his arrest.  Knowing that the petitioner had washed blood out of his van, off of his person, and off of his clothes, the jury was free to infer that he had washed the Leatherman tool as well.

---

[4]A Leatherman tool is a brand-name utility knife, resembling a butterfly knife, that is the functional equivalent of a Swiss Army knife.

To be sure, the petitioner notes the absence of any direct evidence that the Leatherman tool was the actual murder weapon. This observation does not get the petitioner very far. The medical examiner testified that the tool was "consistent" with the stab wounds, and the jurors were entitled to draw a reasonable inference that it was the murder weapon.[5]

Forensic evidence reinforces the inference that the petitioner murdered the bishop. This includes evidence of the victim's blood in the petitioner's van; evidence of a fingerprint, confirmed as the petitioner's, in that blood; evidence of the victim's blood on the petitioner's shoe; evidence of the victim's blood on the washing machine used by the petitioner; traces of occult blood, imperceptible to the naked eye, on the petitioner's clothes and hands; and traces of occult blood on the keys to the van.

In our view, the Commonwealth's case also drew sustenance from the petitioner's persistent prevarications. These lies included both his initial denial of any knowledge about the bishop's death and his subsequent waffling about the whereabouts of the keys to his van. These demonstrated falsehoods called into

---

[5]The petitioner emphasizes that the wounds were free of contusions and suggests the Leatherman tool's three-inch blade could not have created the four-inch-deep gouges in the bishop's lung without substantial bruising of the skin. But there is no basis in this record for such biomechanical certitude, and the petitioner's suggestion is mere speculation.

play the principle that if the jury disbelieves a defendant's story, it may legitimately presume that the fabrication was an indicium of his guilt. See United States v. Jimenez-Perez, 869 F.2d 9, 11 (1st Cir. 1989); cf. Wright v. West, 505 U.S. 277, 315 (1992) (O'Connor, J., concurring) ("It is utterly reasonable to conclude that a possessor of recently stolen goods who lies about where he got them is the thief who took them.").

Then, too, the Commonwealth proffered some evidence of motive. According to unrebutted testimony, during the months before the murder the petitioner ran up substantial debt by using a company credit card to fund a gambling binge. These witnesses said that Bishop Henri reacted adversely when he learned of this peccadillo. While this motive evidence is not particularly robust and the petitioner was able to point to other testimony indicating that he and the bishop were on good terms shortly before the murder, it was within the jury's province to decide whether the petitioner's misconduct remained a bone of contention. See United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006); United States v. Passos-Paternina, 918 F.2d 979, 985 (1st Cir. 1990).

Last — but perhaps not least — the record is barren of any evidence as to who besides the petitioner could have inflicted the fatal stab wounds. This lack of any evidence pointing elsewhere bolstered the inference that it was the petitioner who slew the bishop. See Stewart v. Coalter, 48 F.3d 610, 615 (1st

-14-

Cir. 1995) (explaining that "a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely").

The petitioner tries to tear holes in this tightly threaded tapestry of turpitude. He asseverates that the paucity of blood at the ditch site and in the van indicate that death must have occurred before the body was transported from the church grounds. The difficulties with this asseveration are twofold: the record does not validate the first of the component claims; and the second proves nothing. We explain briefly.

Through the testimony of a forensic chemist and a police sergeant, the prosecution showed substantial blood accumulation at the ditch site. Nothing in the record tends to impeach the credibility of those witnesses in any material way. Thus, we have no principled choice but to assume that the jury chose to credit that testimony. See United States v. O'Brien, 14 F.3d 703, 707 (1st Cir. 1994).

The absence of large quantities of blood in the van is unremarkable. The prosecution introduced evidence showing that the petitioner had washed the van's interior after using the vehicle as a means of transporting the wounded man. Thus, a rational juror need not have raised an eyebrow at the minimal quantity of blood remaining.

-15-

In a last-gasp effort to impugn the verdict, the petitioner strives to rebut the medical examiner's testimony with evidence (e.g., grand jury minutes and a police report) not presented to the trial jury. That effort is jejune: in passing upon the sufficiency of the evidence, a federal habeas court normally must take the state-court record as it stands.[6] See Jackson, 443 U.S. at 324; Eady v. Morgan, 515 F.3d 587, 601 (6th Cir. 2008); see also United States v. Mergerson, 4 F.3d 337, 348 n.14 (5th Cir. 1993) (holding that testimony not admitted into evidence before the jury cannot be considered for the purposes of sufficiency review). The petitioner has identified no valid basis for supplementation of the evidentiary record here.

To sum up, the state-court jury had before it the petitioner's admission that he had disposed of the bishop's body, evidence from which it could infer that he was present at the time and place of the slaying, evidence of a serviceable murder weapon in the petitioner's possession, evidence of a furtive attempt to clean up telltale blood, evidence of motive, evidence of the petitioner's mendacity, and no evidence suggesting an alternative scenario for the homicide. The jury also had before it the petitioner's self-fulfilling prophecy that when the officers found

---

[6]We say "normally" because it may be possible to supplement the record on occasion with, say, evidence that was not discoverable through due diligence at the time of the original trial, see 28 U.S.C. § 2254(e)(2); Brown v. Farwell, 525 F.3d 787, 793-94 (9th Cir. 2008), or evidence establishing actual innocence.

the keys to the van they would simultaneously find the bishop's killer. On the whole of this record, the jury was entitled — though not compelled — to conclude beyond any reasonable doubt that the petitioner was guilty of first-degree murder as a principal. Thus, the evidence was constitutionally sufficient (indeed, ample) to ground the petitioner's conviction. <u>See</u> <u>Spinney</u>, 65 F.3d at 234 (holding that "[r]eliance on indirect, as opposed to direct, evidence in a criminal case is both permissible and commonplace").

We need go no further. While the petitioner, ably represented, has struggled mightily to develop a plausible theory of innocence, that struggle proves fruitless. In order to pass muster under sufficiency principles, evidence need neither compel a finding of guilt nor rule out every hypothesis inconsistent with a guilty verdict. <u>See</u> <u>United States</u> v. <u>Dwinells</u>, 508 F.3d 63, 74 (1st Cir. 2007); <u>United States</u> v. <u>Sawyer</u>, 85 F.3d 713, 733 (1st Cir. 1996). It is enough if the evidence, when viewed favorably to the verdict, establishes every element of the offense of conviction beyond a reasonable doubt. Although the prosecution's case here is not airtight — few cases ever are — the record leaves a rational juror more than enough room to draw inferences that adequately support a finding of guilt. Accordingly, the district court did not err in refusing to issue a writ of habeas corpus.

-17-

**Affirmed**.