# United States Court of Appeals
## For the First Circuit

No. 10-1836

DEREK SIVO,

Petitioner, Appellant,

v.

A.T. WALL,
Director, Rhode Island Department of Corrections,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Torruella, Boudin and Lipez,

Circuit Judges.

Richard K. Corley, by appointment of the court, for appellant.
    Aaron L. Weisman, Assistant Attorney General, with whom
Patrick C. Lynch, Attorney General, was on brief for appellee.

June 30, 2011

**BOUDIN**, <u>Circuit Judge</u>. Derek Sivo, convicted of first-degree child abuse in state court, appeals from the federal district court's denial of his petition for a writ of habeas corpus. The charge against Sivo was that he inflicted injuries on John W. Jr. ("J.J."), the then two-and-a-half-year-old son of Sivo's girlfriend, Kimberly Mathieu ("Kim"). Sivo's central claim now before us is one of insufficient evidence. We outline briefly the central facts and prior proceedings.[1]

On November 1, 2001, Kim and J.J. woke up at around 7:30 or 8:00 a.m. and went out for breakfast. J.J. said that he did not feel well and wanted to stay home that day. Kim left for work at around 11:15 a.m., leaving J.J. in the care of her boyfriend, Sivo. Kim called home between 3:30 and 4:30 p.m. and Sivo said that J.J. was sick.

Upon Kim's return home from work at around 6:30 p.m., Sivo told Kim that J.J. was not feeling well and had earlier that day fallen down some of the stairs that led to their basement apartment. Sivo reported that when J.J. fell, he was not crying and seemed mostly okay. When Kim went in to check on J.J., who was sleeping, he awoke and said "Hi, Mommy," and then resumed his

---

[1]The facts are primarily drawn from the Rhode Island Supreme Court's decision affirming Sivo's conviction, <u>State</u> v. <u>Sivo</u>, 925 A.2d 901 (R.I. 2007), and are supplemented when necessary with facts from the record when they are consistent with the Rhode Island Supreme Court's findings, <u>see</u> <u>Lynch</u> v. <u>Ficco</u>, 438 F.3d 35, 39 (1st Cir.), <u>cert. denied</u> 549 U.S. 892 (2006).

sleep; Kim felt that J.J. was running a "little fever," and so she gave him Motrin and checked on him periodically during the night.

The next morning, on November 2, 2001, J.J. did not wake up as usual at 7:30 or 8:00 a.m. When Kim awoke at 10:00 a.m. and realized that J.J. was still sleeping and found him "not responsive," she called J.J.'s pediatrician, Dr. Cheryl Flynn. When Kim brought J.J. to Dr. Flynn's office later that day, Dr. Flynn found that J.J. was barely awake but "arousable"; was having trouble "hold[ing] himself up"; and "could not bear [his own] weight or walk." At Dr. Flynn's direction, J.J. was taken to Hasbro Children's Hospital.

At the hospital, J.J. was found to be in an "altered level of consciousness" and was "virtually nonresponsive." J.J. was treated by Dr. John Allison Duncan III, chief of neurosurgery at Brown University Medical School and an expert in pediatric neurosurgery, and Dr. Seth Asser. They determined that he had incurred a subdural hematoma--a collection of blood on the surface of the brain--and was suffering increased intercranial pressure that threatened his life.

In an emergency operation, the surgeons removed two blood clots from J.J.'s brain--a "fresh" one caused by an injury that the doctors determined occurred sometime between a few days to a few hours before the surgery, and an older one that was four to eight weeks old. While the surgery saved J.J.'s life, he suffers

significant complications from his injuries, including weakness on his right side, lack of peripheral vision, speech problems and a permanent limp. Hasbro's Child Protection Team contacted the police.

A detective from the Cranston Police Department arrived at Hasbro at 7:00 p.m. the same evening, questioned Kim and one of J.J.'s doctors and then summoned Sivo. Sivo came to the station at 10:40 p.m. and repeated what he had told Kim earlier: that J.J. fell down the last few stairs on the way down to their basement apartment; that J.J. was not crying after the fall, and only indicated that his "butt" and the back of his head hurt; and that J.J. napped later that day because he was ill. Sivo also gave similar statements to other investigators.

On February 13, 2002, the Cranston Police Department filed a criminal information charging Sivo with one count of first-degree child abuse of a child under the age of five, in violation of state law. R.I. Gen. Laws § 11-9-5.3 (2002). The offense occurs when "a person having care of a child . . . knowingly or intentionally . . . [i]nflicts upon a child serious bodily injury." Id. § 11-9-5.3(b)(1). Serious bodily injury is defined to include injury that creates a substantial risk of death, causes protracted impairment of function or evidences subdural hematoma. Id. § 11-9-5.3(c).

-4-

At trial, the jury heard--in addition to what is recounted above--testimony from all three doctors who saw J.J. on November 2. Doctors Duncan and Asser testified that the subdural hematomas must have been caused by a severe blow such as a fall from a significant height; that the injury was "non-accidental"; that (according to Dr. Duncan) a fall down the stairs could explain the injury only if J.J. were thrown down the stairs and landed primarily on his head; and that (according to Dr. Asser) child abuse was the likely cause. None of the three doctors identified signs of abuse other than the subdural hematomas.

Sivo presented as a witness Dr. Thomas Morgan, a neurologist; Dr. Morgan gave as his medical opinion J.J. was not the victim of abuse: J.J. had none of the telltale signs of being abused, including facial bruises, a black eye, a broken jaw, chest or pelvic injuries, fractured skull, broken ribs or swollen tissue. Dr. Morgan suggested that the subdural hematomas were likely caused by an August 2001 seizure that resulted in J.J. becoming weaker on his right side and more prone to falls.

Dr. Morgan further testified that J.J. was predisposed to developing subdural hematomas, and so any fall--including a fall down the stairs--could have triggered one; and that the lack of external evidence of abuse and J.J.'s behavior on November 1-2--at first normal but becoming progressively weaker and more lethargic-- was consistent with Dr. Morgan's assessment. Dr. Morgan conceded

that he never examined J.J., but instead based his conclusions on a review of police reports, medical records and an interview with Kim.

There was conflicting evidence on yet another matter. According to Kim, falling was not unusual for J.J.; she claimed that after two falls in August 2001, J.J. began falling frequently, a matter that concerned Kim enough to raise it with J.J.'s pediatrician. J.J.'s maternal grandmother, Roseann Mathieu ("Roseann"), and his biological father, John W. Sr., testified for the state, asserting that J.J. was not clumsy and fell no more than an average two-year-old. Roseann also testified that J.J. often did not want to go to Sivo's home.

At the close of evidence, Sivo moved for a judgment of acquittal, which was denied. On October 23, 2002, the jury found Sivo guilty of first-degree child abuse; he was later sentenced to twenty years imprisonment, twelve to serve and eight suspended with probation. Although the Rhode Island Supreme Court ordered a hearing in the trial court on Sivo's new trial motion, that motion failed and the Rhode Island Supreme Court ultimately affirmed the conviction and sentence.

Thereafter, a federal district court considered a habeas petition by Sivo, 28 U.S.C. § 2254 (2006), ultimately denying relief but granting a certificate of appealability on one issue, id. § 2253(c)(2), namely, "whether the denial of Sivo's motion for

judgment of acquittal violated his constitutional rights." Our review of the district court is de novo, Santiago v. O'Brien, 628 F.3d 30, 33 (1st Cir. 2010), but our review of the underlying state court determination--that the evidence against Sivo was sufficient--is more restricted.

Specifically, under the habeas statute, factual determinations by state trial and appellate courts are presumed correct unless disproved by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Clements v. Clarke, 592 F.3d 45, 47 (1st Cir.), cert. denied, 130 S. Ct. 3475 (2010). As to legal issues, the state court legal ruling must stand unless it is contrary to Supreme Court precedent or amounts to "an unreasonable application of" clearly established such precedent, 28 U.S.C. § 2254(d)(1), which requires more than mere disagreement by the federal court, McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc).

The federal constitutional rule invoked by Sivo is based on the due process clause of the Fourteenth Amendment and set forth in Jackson v. Virginia, 443 U.S. 307, 313-16 (1979). The standard under Jackson is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. The Rhode Island court evaluated Sivo's claim under state law doctrine equivalent to Jackson, see State v. Day, 925 A.2d 962, 974 (R.I. 2007), so the "unreasonable application"

test governs, Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009), cert. denied, 130 S. Ct. 1710 (2010).

In practice habeas review under Jackson, constrained by doctrines already described, is reserved for unusual cases and its standard "is rarely met where there is plausible evidence to support a verdict." Tash v. Roden, 626 F.3d 15, 20 (1st Cir. 2010). Put differently, Jackson applies where there is no substantial evidence of guilt or where the evidence amounts to little more than colorable speculation. O'Laughlin v. O'Brien, 568 F.3d 287, 300-01 (1st Cir. 2009), cert. denied, 130 S. Ct. 1142 (2010). In this case the evidence against Sivo was circumstantial but it was nevertheless substantial.

First, the two doctors who were most closely involved in treating J.J. for the subdural hematoma testified that it could only have occurred with an extremely powerful blow or by being thrown from a considerable height and was not consistent with a mere stumble down a few stairs. The defense expert disagreed but he had not examined J.J., and in any event the jury, which heard the witnesses testify, is entitled to evaluate their credentials and the persuasiveness of their explanations. See United States v. Calderon, 77 F.3d 6, 10 (1st Cir. 1996).

Second, Sivo was alone with J.J. for the pertinent period. The state's medical testimony was that once J.J.'s injury occurred, he would not have been able to function normally: Dr.

-8-

Asser testified that J.J.'s injury would not be "consistent with any kind of lucid interval," and that J.J. would likely have been groggy, would not have been able to stand or walk, would not respond if someone talked to him or moved him, and would have been moaning. Yet, Kim's testimony indicates that, at breakfast the same day and before he was entrusted to Sivo, J.J. was functioning normally even if he did not feel well.

Third, Sivo's own statement to Kim during their phone call--he did not testify at trial--confirmed that J.J.'s condition worsened while he was in J.J.'s care and he was asleep and apparently groggy when his mother arrived home, worse the next morning and by that afternoon almost unable to function. Combined with the medical testimony, this fairly indicates that something occurred while J.J. was in Sivo's care that precipitated the injury.

Fourth, both Dr. Duncan and Dr. Asser testified that the injury was consistent with J.J. having been hit hard with a hard object; there was no evidence that he had fallen from a great height or been in a car crash; and the only explanation provided before trial by Sivo (that J.J. had stumbled down a few stairs) was ruled out by Dr. Duncan as sufficient to cause so serious an injury. Roseann's testimony that J.J. did not want to be left with Sivo reinforced, if only slightly, the likelihood that Sivo had struck the child.

On appeal, Sivo points out that no one can show exactly how the injury was incurred, but that is of little help to his position. If the jury could rationally conclude that the only plausible injury was a fierce blow and that only Sivo was around to administer it, the precise motive, weapon and other details are not critical to the chain of reasoning. Nor does the lack of obvious signs of prior abuse absolve Sivo. A single act of great violence is as much a violation as a string of episodes.

Sivo also says that the state failed to rule out all other possible scenarios that would be consistent with Sivo's innocence, but that is not part of the state's burden: "'[b]eyond a reasonable doubt' does not require the exclusion of every other hypothesis; it is enough that all 'reasonable' doubts be excluded." Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir.), cert denied, 516 U.S. 853 (1995). In fact, Dr. Asser testified that there was no reasonable explanation other than deliberate violence for this injury.

Sivo also submitted to this court articles published in medical journals that express the view that subdural hematomas can arise in some children for reasons other than abuse and severe trauma.[2] However, one such article explains that in a study of the

---

[2]E.g., Thomas Pittman, Significance of a Subdural Hematoma in a Child with External Hydrocephalus, 39 Pediatric Neurosurgery 57, 57-58 (2003) (noting that some conditions "predispose a child to develop a subdural hematoma after even minor injury," and discussing specifically one condition--external hydrocephalus--that

-10-

causes of subdural hematomas, only four percent of those caused by accident were the result of falls, all from a height of "greater than 10 feet onto unyielding surfaces," Kenneth Feldman et al., The Cause of Infant and Toddler Subdural Hemorrhage: A Prospective Study, 108 Pediatrics 636, 643 (2001), and discusses an extensive body of literature that suggests that "stairway falls are unlikely to cause serious infant and toddler injury," id. at 637.

What is more, the articles are not evidence presented to the jury and the question is whether a rational jury could convict on the evidence before it. Leftwich v. Maloney, 532 F.3d 20, 27 (1st Cir. 2008). For habeas claims generally, the record is that developed in the state court, Cullen v. Pinholster, 131 S. Ct. 1388, 1398-99 (2011), save in very limited circumstances not present here--for example, when evidence was not discoverable through due diligence at the time of the trial, see 28 U.S.C. § 2254(e)(2); Leftwich, 532 F.3d at 27 & n.6.

This case is readily distinguishable from O'Laughlin, 568 F.3d at 287. There, the defendant was a highly plausible suspect in a murder, but there was no evidence that he had in fact been present--let alone uniquely present--at the time that murder occurred. J.J. was unquestionably in Sivo's custody, and the

---

might make children especially prone to developing subdural hematomas).

explanation for the injury given in Sivo's statement to the police was directly contradicted by the testimony of two doctors.

In sum, the Rhode Island Supreme Court did not unreasonably apply the Jackson standard in upholding the jury's verdict, and the district court did not err in denying the petition for habeas.

Affirmed.

**--Concurring opinion follows--**

**TORRUELLA**, **Circuit Judge**, **Concurring.** I join the majority because the deferential standard of review compels that we affirm Derek Sivo's conviction, but write separately to stress how near to the boundary this case falls.

The evidence, when viewed in the light most favorable to the prosecution, showed that J.J.'s injury required a high degree of force -- far in excess of the defendant's suggested cause -- and that it was suffered while in the care of the defendant. The prosecution, however, offered no explanation as to how or why J.J.'s injury took place,[3] other than to generally attribute the injury to the defendant. On this decidedly sparse basis a jury returned a conviction, which was then in turn upheld by the Rhode Island Supreme Court. See State v. Sivo, 925 A.2d 901 (R.I. 2007).

Although circumstantial evidence can be sufficient to sustain a conviction, O'Laughlin v. O'Brien, 568 F.3d 287, 302 (1st Cir. 2009), cert. denied, 130 S. Ct. 1142 (2010), it must still meet some constitutional baselines. A conviction will survive habeas review if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

---

[3]Dr. Duncan testified that he did not see any marks on J.J.'s body evidencing the cause of his injury and that he could not say where or how J.J.'s injury occurred, but could pinpoint the approximate time of J.J.'s two brain injuries. State v. Sivo, 925 A.2d 901, 907 (R.I. 2007).

-13-

doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).

We accept, as we must, the assessment (by the prosecution's experts) of the approximate time as of which J.J. suffered his injury, and, consequently, that the injury took place while in the sole care of the defendant.[4] However, this evidence is not sufficient, by itself, to sustain Sivo's conviction, since one of the elements of the crime in question requires that the defendant "knowingly or intentionally" inflict serious bodily injury. R.I. Gen. Laws § 11-9-5.3(b)(1) (2002). Therefore, only in conjunction with the finding that the injury was knowing or intentional can the prosecution's evidence suffice. Dr. Duncan and Dr. Asser testified to this effect, opining that the injury was "non-accidental." Sivo, 925 A.2d at 907-08. How they were able to reach such a conclusion from merely observing a subdural hematoma is at least one of the circumstances that causes me to have concerns regarding the outcome we must approve. Be that as it may, this was apparently valid opinion evidence, which was rebutted by defendant's expert and ultimately believed by the jury. Hence the question becomes whether the jury can convict a defendant -- of knowingly or intentionally inflicting serious bodily injury to a

---

[4]Dr. Duncan testified that a blow, sufficiently powerful to leave a subdural hematoma, would have left J.J. in such a state that his mother would have noticed before she left. See Sivo, 925 A.2d at 907.

-14-

child -- on the basis that the defendant had sole access to the child when the latter suffered an injury that, according to the prosecution's expert witnesses, could not have been accidental.

The criminal justice system must allow for some inferences in order to properly function, but courts must endeavor to ascertain the point at which a reasonable inference becomes overly speculative. This case poses such a quandary. Although we must draw all reasonable inferences in favor of the prosecution, "a reviewing court must refrain from giving credence to evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." Foxworth v. St. Amand, 570 F.3d 414, 425 (1st Cir. 2009) (internal quotations omitted). Some level of intellectual rigor beyond bald acceptance of state court findings is required. Id. We approached a similar issue in O'Laughlin, overturning a denial of a habeas petition where the prosecution's case relied primarily on the defendant's mere presence near the scene of the crime. O'Laughlin, 568 F.3d at 302. While the instant case may have a superficial congruency to O'Laughlin, there remains a crucial distinction. Whereas in O'Laughlin there were numerous individuals with access to the victim, Sivo had sole custody of J.J. during the critical period. Hence, Sivo's conviction resulted not from the rank speculation found in O'Laughlin, but from a reasonable inference that the only individual capable of inflicting the injury did in fact do so, a

-15-

criminal res ipsa loquitur.  The line separating permissible inferences from groundless speculation defies clarity, but it lies somewhere between the instant case and O'Laughlin.

In the present case, a rational jury could find Derek Sivo guilty beyond a reasonable doubt, if it believed the government's circumstantial case.  That said, although I concur with the majority, I wish to stress how scant the evidence against Sivo was.  The prosecution's medical testimony was barely sufficient to sustain the conviction.  If anything, the prosecution's doctors disproved the defendant's suggested explanation for J.J.'s injury, but failed to provide a more specific cause than "acceleration and deceleration of the brain like that caused by a car accident or a fall from a height of several stories."  Sivo, 925 A.2d at 908.  There was no history of child abuse or outward signs of the cause of J.J.'s brain injury and the prosecution could offer no explanation for why or how Sivo purportedly administered the injury, even though such an injury allegedly required the force of a car accident, severely limiting the possible causes.  Id. at 907-08.  Further, Dr. Duncan testified that typically there is a visible mark on the scalp of a child who suffers a subdural hematoma, yet none of the three doctors who examined J.J. saw one.  Id. at 907.  In addition, it is debatable how the prosecution's expert witnesses could have opined with confidence that J.J.'s injury was "non-accidental," where they

admitted to not being able to ascertain how or where it occurred and where the possible explanations provided by such experts (e.g., a car accident or a fall from height) are situations that may also ostensibly occur accidentally.

The prosecution's construction of the pertinent time line was also suspect. J.J.'s mother was able to communicate with him after the alleged blow (e.g., J.J. responded "Hi, Mommy" when Kim checked on him after returning from work on November 1), see Sivo v. Wall, 2010 U.S. Dist. LEXIS 65045, *13-14, 2010 WL 2636024, *4 (D.R.I. June 28, 2010), in direct contradiction to Dr. Asser's testimony that, immediately following the injury, J.J. would not have responded if someone talked to him or moved him, and would have been moaning, see Sivo, 925 A.2d at 908.

The aforementioned inconsistencies, compounded by the generally meager offering of proof, should have given the jury pause. Instead, the jury convicted and put a man in jail on a showing of evidence that flirts with the fringes of permissibility, even under Jackson's limited review.

Though I believe this case to be exceedingly close, given the limited review which is available to this court, I have no choice but to concur in affirming this outcome. I do so, however, with extreme reluctance. I would not have convicted Derek Sivo, but the jury was within its rights, if ever so barely.