Kaplan, Mitchell H., J.
In early 2014, plaintiff Christopher Burns and defendants Hugh Taylor and Lisa Franks formed an investment advisoiy firm which they called Taylor Wealth Management Partners. Although they planned on entering into a formal written agreement that would define the terms of their business arrangement, they began their joint enterprise before they had agreed upon all of the terms and memorialized their agreement in a written contract. By December 2014, terms of their agreement were still being debated, the parties’ relationship had soured, and Taylor, -with Franks’ consent and assistance, told Burns that he must leave the firm. Aggrieved by the termination, Bums filed this action against Taylor and Franks, alleging that their actions constituted a breach of contract and a breach of fiduciary duly. The matter is now before the court on the defendants’ motion for summary judgment. For the reasons that follow, the motion is ALLOWED, in part, and DENIED, in part.
BACKGROUND
At some point in 2013, Taylor left the investment advisoiy firm that he had founded many years before. He discussed with Bums and Franks a plan to form a new investment advisory firm in which they would each be partners. Burns and Franks agreed to participate in Taylor’s new venture. Although Taylor initially recommended that the firm name include each of their last names, the parties eventually decided to call the firm Taylor Wealth Management Partners (TWMP). Taylor contributed the capital necessary to start the firm and succeeded in bringing many of his former clients to the new firm. Franks and Burns contributed no capital. The record is not clear as to whether they brought any clients to the new firm, but certainly the vast majority of the clients had pre-existing relationships with Taylor.
Taylor, Bums, and Frank hired Attorney Kim Taylor to assist them in organizing the firm; in particular, drafting an agreement to govern the parties’ business relationship. Attorney Taylor, then asked Attorney Scott Pinarchick to provide tax advice to the group. On January 13, 2016, Attorney Taylor filed a certificate of organization with the Secretary of the Commonwealth establishing a limited liability company to be known as Taylor Wealth Management Partners, LLC.[1] The certificate listed Taylor as the manager and resident agent, and made no reference to Bums or Franks. Approximately two weeks later, Attorney Taylor drafted a preliminary summary term sheet for the LLC. The draft was titled “Summaiy of Terms — Taylor Wealth Management LLC” and bore the legend “FOR DISCUSSION PURPOSES ONLY.” It contained provisions governing capital investments, distributions, compensation, buyout obligations, decision-making authority, and terminations.
In mid-February 2014, Attorney Taylor prepared another draft of the term sheet following additional discussions among the parties. Unlike the previous draft, this one explicitly provided that Taylor would own 800 common units of TWMP and that Bums and Franks would each own 100 units. Soon thereafter, Taylor filed TWMP’s initial Uniform Application Investment Adviser Registration on Form ADV with the Securities and Exchange Commission. He signed the form under penally of perjury. The form identified *90 Taylor as owning “75% or more” of TWMP as of January 2014, Franks as owning “10% but less than 25%” as of January 2014, and Bums as owning “10% but less than 25%” as of February 2014. Attached to the form was a brochure prepared by Taylor which stated that Taylor owned 80% of the firm, while Bums and Franks each owned 10%. Taylor later filed two additional Forms ADV in June and December 2014 containing the same firm ownership information.[2]
By February 2014, TWMP was up and running and each of the parties was actively working for the firm and dealing with its day-to-day business. Although it had been anticipated that Bums and Franks would contribute capital to the firm, the parties agreed that their contributions were unnecessary because the firm had been so successful in attracting Taylor’s former clients and had sufficient cash to meet its needs.
Over the next few months, the parties met several times to discuss revisions to the term sheet. Attorney Taylor prepared a number of iterations of the term sheet in March and May 2014 to reflect the parties’ ongoing discussions. Each draft contained the header “FOR DISCUSSION PURPOSES ONLY” and each indicated that Taylor would own 80% of the firm, while Franks and Burns would each own 10%. Among the terms that remained the subject of continued negotiations was the so-called buyout provision. Taylor is substantially older than Burns and Franks. The parties had agreed that there would be a transfer of ownership from Taylor to Bums and Franks over the next few years and this provision was intended to govern the timing and manner in which Taylor’s interest would be redeemed.
On June 18, 2014, as negotiations continued, Franks sent an email to Attorneys Taylor and Pinarchick following a conversation with her accountant, Rick Eckstein. Franks wrote:
I spoke to my accountant yesterday and he wanted to verify your position on my 10% equity out of the gate from the formation of our Taylor Wealth Management business. I understood that since I was in at day 1 then there would be no value associated with my ownership that could have tax [sic] other than the retained earnings we had discussed where the business would pay the tax before distributions . . . While we have still yet to sign a partnership agreement our discussions have always led me to believe that there is a partnership set up (last Fall) ■with ownership that predates assets coming over from Taylor Investment Counselors [Taylor’s former firm] to us at Taylor Wealth Management.
Attorney Pinarchick replied on June 30, 2014, explaining that:
The way I see it is that that [sic] three of you sent [sic] up an LLC early this year. It is a partnership for tax purposes and the split is 80/10/10 between you and your partners. As you said [in your email], you have 10%. I would expect any income earned this year to be split on those percentages. You and the others will owe income tax on your share . . . When the agreement is finalized I would expect it to reflect all this [sic] items. At this point, the agreement is an oral one. You really need to have a written agreement in the event of any disagreements. The main sticking point with the agreement has been Hugh [Taylor]’s buy back and transition to you and Chris [Burns] over the next several years. I am [sic] hope we can finalize this soon and memorialize it in the agreement.
Eckstein, who had been copied in the above email correspondence, subsequently wrote to Franks, addressing Attorney Pinarchick’s remarks and discussing the tax implications of her ownership interest. In response, Franks replied “I am having a hard time following. Basically, Hugh [Taylor] would not have had a firm unless Chris [Burns] and myself were his partners. We earned the business therefore together.”
On August 15, 2014, Taylor emailed Burns asking him to provide feedback on the latest draft of the term sheet (apparently the May 2014 draft): In the email, Taylor expressed disappointment that it was taking so long to get a “corporate entity” established and noted that the delay was making marketing and trading difficult for the firm. He also indicated his hopes that the agreement would be finalized within the next month. Burns responded a few hours, later, stating:
I think that we’re exactly where we should be. These things take time. It was perhaps wishful thinking on my part believing that I could fully understand all of the key human/business issues/complexities in 30-60 days in order to formalize an agreement . . . Our relationship was built on friendship, and its evolving to one of partner. Very different. It takes time to understand the issues involved with day to day interpersonal execution ... So back burner your disappointment regarding timing. This is a marathon, not a sprint.
Taylor replied stating: “Well said, and I appreciate how much and how far you have come with me, with the business concept, with your business acumen, with working with and respecting and enjoying working with Lisa who is a real Gem, and the maturity and standards and values you bring to this .venture and to each one of us.”
Following this email exchange, Taylor and Franks grew worried that Burns was not sufficiently committed to finalizing the term sheet and that the negotiations were at an impasse.[3] Because of these reservations, in October 2014, Franks directed Attorney Sarah Camougis to draft an alternate term sheet that excluded Burns.[4] Attorney Camougis did so and sent two term sheets to Franks on November 14,2014, one that included Burns and another that did not. Franks provided the former to Burns almost two weeks later.[5] Burns was unaware of the alternate term sheet.
*91 By late November, Franks had concluded that she and Taylor would not be able to have an effective working relationship with Bums. Although he initially held a different view, Taylor eventually came to the same conclusion. On December 2, 2014, Taylor met with Bums and asked him to leave the firm. Sometime thereafter, he gave Bums a proposed severance agreement. Bums refused to sign the document and continued to occupy his office in the weeks that followed. On January 16, 2015, Bums’ phone and computer access were shut off and Taylor demanded that he leave the office permanently. Burns did so and filed this lawsuit a few months later.
DISCUSSION
In his First Amended Complaint, Bums asserts claims for breach of fiduciary duty against Taylor and Franks (Counts I and II), breach of contract against Taylor (Count III), and breach of the implied covenant of good faith and fair dealing against Taylor and Franks (Count IV). Counts I and II are based on Burns’ contention that he was an equity holder in TWMP along with Taylor and Franks and that Taylor and Franks breached their fiduciary duties to him by forcing him out of the firm and denying his ownership interest in the firm. Counts ni and IV are based on the assertion that Taylor and Franks entered into a binding LLC operating agreement and that Taylor, with Franks’ assistance, breached that agreement by forcing him out of TWMP. The defendants argue they are entitled to summary judgment on all these claims because the parties never entered into a written agreement governing their relationship. While defendants are entitled to summary judgment on Counts El and IV, summary judgment will not enter on Counts I and II.
A. Breach of Contract and the Implied Covenant
“It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.” Situation Mgmt Sys., Inc. v. Malouf, Inc., 430 Mass. 874, 878 (2000). While it is not required that an agreement address every term of the parties’ relationship, an agreement will only become binding once the parties “progressed beyond the stage of ‘imperfect negotiation.’ ” Id. “Normally the fact that parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled.” Rosenfield v. United States Trust Co., 290 Mass. 210, 216 (1935). However, “[i]f all the material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract, which is already final by the earlier mutual assent of the parties to those terms.” Id. The question of whether a contract has been made is typically one of fact to be resolved by the factfinder but if the evidence consists only of writings, or is uncontra-dicted, the question is for the court. David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc., 8 Mass.App.Ct. 237, 239 (1979).
In Counts in and IV, Bums alleges that the parties entered into a binding oral operating agreement containing all material terms. He concedes that the parties never finalized the term sheet but argues that the document merely represented the parties’ attempt to memorialize the terms of the parties’ oral agreement and address subsidiary issues that were Immaterial to their arrangement. The undisputed evidence establishes that this was not the state of the parties’ negotiations and important, material terms were still unresolved.
The term sheet did not represent an attempt to formalize an already established agreement. The parties’ contemporaneous emails and the various iterations of the term sheet, each of which was labeled “FOR DISCUSSION PURPOSES ONLY,” demonstrate that material terms remained the subject of negotiation throughout 2014. Chief among them was how and when Taylor’s interests in the firm would be acquired by Bums and Franks. This term was clearly of great importance to Taylor. Taylor was significantly older than Burns and Franks, TWMP’s clients were either wholly or principally investors with pre-existing relationships with Taylor, and Taylor formed TWMP with the stated intention of transferring the business to Franks and Burns within the next few years. The timing and economics of that transfer were clearly highly material to Taylor, and, therefore, also to Burns and Franks who would have to assume control of the firm and pay Taylor for his interests. Because there was never a meeting of the minds with respect to all of the material terms of the proposed limited liability agreement, the parties never formed an enforceable contract. Accordingly, Burns’ breach of contract claim (Count III) fails as a matter of law. Because the covenant of good faith and fair dealing is an implied term in an existing contract and the parties did not enter into a contract, Count IV also fails as a matter of law. See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).
B. Breach of Fiduciary Duty Claims
In moving for summary judgment on Counts I and II, the defendants argue that they owed Burns no fiduciary duties because, Bums, along with Franks, was merely an at-will employee who worked for Taylor. See Estate of Moulton v. Puopolo, 467 Mass. 478, 493 (2014) (“An employer . .. owes no fiduciary duty to an employee”). The court cannot decide the question of the nature of the parties’ relationship to one another as a matter of law on the summary judgment record before it. There is, at the very least, a disputed issue of fact concerning whether, through their words and *92 conduct, the parties entered into a partnership and therefore owed each other fiduciary duties.
The Uniform Partnership Act (UPA) defines a partnership as “an association of two or more persons to carry on as co-owners a business for profit.” G.L.c. 108A, §6. Several factors are considered in determining whether a partnership exists, including whether there is: “(1) an agreement by the parties manifesting their intention to associate in a partnership, (2) a sharing by the parties of profits and losses, and (3) participation by the parties in the control or management of the enterprise.” Fenton v. Bryan, 33 Mass.App.Ct. 688, 691 (1992). A written agreement is not required to form a partnership. Kansallis Finance Ltd. v. Fern, 40 F.3d 476, 479 (1st Cir. 1994). “(I]ntent to cany on business as partners may be inferred from the partners’ words and acts.” Id.; see also Fenton, 33 Mass.App.Ct. at 689-91 (partnership existed despite the absence of a written partnership agreement). In the present case, the record contains evidence suggesting that the parties intended to operate TWMP as partners during the period that they worked together.
In a December 2013 email, sent before TWMP opened for business, Taylor recommended including both Franks and Bums’ names in the firm’s name, a fact suggesting that Taylor intended Burns and Franks to be his partners rather than employees of a sole proprietorship that he owned.[6] Just as significant, in a June 2014 email exchange between Franks and Attorney Penarchick, both of them indicated that they believed a partnership existed in which Franks and Bums each had a 10% interest. Franks stated that she had a “10% equity [interest] out of the gate from the formation of our Taylor Wealth Management business” and that “(w]hile we have still yet to sign a partnership agreement our discussions have always led me to believe that there is a partnership set up (last Fall).”[7] In reply, Attorney Penarchick wrote that TWMP was “a partnership for tax purposes and the split is 80/10/10 between you and your partners.”[8]
Additionally, the record contains evidence that Franks and Burns acted as partners rather than employees. Deposition testimony and contemporaneous emails indicate that all the parties, not just Taylor, were involved in the decision-making concerning the management of TWMP. Taking all this evidence together, a fact finder could conclude that the parties intended to form a partnership and to share the partnership’s profits or losses on an 80%/10%/10% basis.[9] In consequence, a factual dispute exists as to whether the parties were in a partnership prior to Burns’ termination.
If a partnership was formed, Taylor and Franks each owed fiduciary duties to Burns. See Starr v. Fordham, 420 Mass. 178, 183 (1995) (“Partners owe each other a fiduciary duty of good faith and fair dealing”); Meehan v. Shaughnessy, 404 Mass. 419, 433-34 (1989), quoting Cardullo v. Landau, 329 Mass. 5, 8 (1952) (“It is well settled that partners owe each other a fiduciary duty of ‘the utmost good faith and loyalty’ ”). Of course, whether those fiduciary duties were breached also involves disputed questions of fact. While it is undisputed that the defendants excluded Burns from their partnership, it is also undisputed that the parties intended a written agreement to govern their relationship. The record contains evidence suggesting that Burns may have been unwilling to agree on partnership terms concerning the acquisition of Taylor’s interests that were always an essential and understood term of the parties’ business arrangement, thereby making it impossible for the three to continue jointly to work together. In any event, at this stage of the litigation it is sufficient to find that the defendants are not entitled to summary judgment on Burns’ breach of fiduciary duly claims (Counts I and II).
ORDER
For the foregoing reasons, the defendants’ motion for summary judgment is ALLOWED as to Counts III and IV, but DENIED as to Counts I and II.

 Although not in the summary judgment record, the court takes judicial notice of the certificate of organization because it is a matter of public record. See Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000) (matters of public record subject to judicial notice); see also JP Morgan Tr. Co. v. Mid-Am, Pipeline Co., 413 F.Sup.2d 1244, 1258 (D.Kan. 2006) (“public documents filed with the secretary of state . . . generally satisfy the judicial notice standard”); Shurkin v. Golden State Vintners, Inc., 2005 U.S. Dist. LEXIS 39301 at *18-19 (N.D.Cal. Aug. 10, 2005) (taking judicial notice of a certificate of organization).

 Following Bums’ termination, Taylor filed another Form ADV stating that Bums had formerly owned 10% of the firm.

 It appears that by this time, Taylor and Franks were largely in agreement as to the provisions of the term sheet.

 In mid-2014, Attorney Taylor left her firm and Attorney Camougis took her place representing the parties.

 As before, the draft sent to Burns contained the header “FOR DISCUSSION PURPOSES ONLY” and indicated that Taylor would own 80% of the firm, while Franks and Burns would each own 10%.

 At the hearing, the defendants emphasized that Burns was paid a salary and received Form W-2s. This, however, does not establish as a matter of law that Bums was an employee. The fact that a plaintiff received a salaiy does not require a finding that the plaintiff was strictly a salaried employee and not a partner. Fenton, 33 Mass.App.Ct. at 691. Moreover, the defendants admit that Taylor was also paid a salary and received a Form W-2.

 In an email to her accountant, Franks also wrote: “Hugh [Taylor] would not have had a firm unless Chris and myself were his partners. We earned the business therefore together.”

 The Court also notes that Taylor prepared and filed several Forms ADV, signed under penalty of peijury, in which he stated that Burns and Franks each owned 10% of the firm. While certainly not dispositive, the filings are some evidence that Taylor also believed that the parties were partners.

 If a partnership was formed, the rights and obligations of the parties are governed by the UPA because no partnership agreement existed. See BPR Grp. Ltd, P’ship v Bendetson, 453 Mass. 853, 863 (2009) (observing that the UPA applies when there is no partnership agreement governing the partnership’s affairs); Meehan v. Shaughnessy, 404 Mass. *93 419, 430 n.7 (1989) (“Chapter 108A is intended to be a lype of‘form contract’ ”). Under the UPA, the partnership dissolved once Franks and Taylor decided that they no longer wanted Burns to be part of TWMP (December 2014/January 2015). See G.L.c. 108A, §31(b) (dissolution can be caused “(b]y the express will of any partner when no definite term or particular undertaking is specified”). Whether Bums was entitled to anything more than the residual profits, if any, from the partnership upon dissolution is not before the Court. See G.L.c. 108A, §40.